285 F.2d 162
 LOS ANGELES TRUST DEED * MORTGAGE EXCHANGE, Trust Deed &
Mortgage Exchange, Trust Deed & Mortgage Markets, David
Farrell, Oliver J. Farrell, Roy A. Bonner, Thomas Wolfe,
Jr., and Stanley C. Marks, Appellants,
v.
SECURITIES AND EXCHANGE COMMISSION, Appellee.
 No. 16995.
 United States Court of Appeals Ninth Circuit.
 Nov. 23, 1960, Rehearing Denied Jan. 10, 1961.
 
 Morgan Cuthbertson, Laguna, Cal., Paul J. Foley, Washington, D.C., for appellants.
 Thomas G. Meeker, Gen. Counsel, David Ferber, Asst. Gen. Counsel, John A. Dudley, Atty., SEC, Washington, D.C., F. E. Kennamer, Jr., Chief Enforcement Atty., San Francisco, Cal., for appellee.
 Before CHAMBERS, Chief Judge, and BARNES and JERTBERG, Circuit Judges.
 BARNES, Circuit Judge.
 
 
 1
 The Securities and Exchange Commission (referred to herein as SEC) instituted suit against three corporate defendants[1] and five individual officers thereof in the United States District Court for the Southern District of California. Originally the defendants were charged with issuing and selling securities in a fraudulent and deceitful manner, using the mails to effect sales of securities by fraud, and violating certain provisions of the Securities Act of 1933 (15 U.S.C.A. 77q) and the Securities Exchange Act of 1934 (15 U.S.C.A. 78o), with respect to the registration of securities. By amended complaint, the defendants were charged with insolvency. While originally seeking merely injunctive compliance with the Securities Acts, the SEC subsequently additionally requested the appointment of a receiver, and liquidation of the defendant corporations.
 
 
 2
 This matter has been before us previously. Under date of November 17, 1958, this court, after a partial trial below, the granting of a preliminary injunction, and the appointment of a receiver, stayed the operation of such orders pending appeal, issued a substitute restraining order, and expedited the appeal. That appeal was heard on January 23, 1959, and on February 17, 1959, on order was made by this court setting aside the preliminary injunction and order appointing receiver made below for the reasons stated in that opinion and the matter was remanded for a complete trial on the merits. Our restraining order of November 17, 1958, prohibiting and restraining defendants from making any withdrawals of funds save in the ordinary course of business, was continued in full force and effect pending the trial. Cf. 9 Cir., 1959, 264 F.2d 199. For a clearer understanding of the pleadings and issues we refer to that opinion and incorporate in herein by reference. It will not herein be necessary to repeat all the facts.
 
 
 3
 On May 20, 1960, the court below, after a full trial, appointed a receiver for two of the three named corporate defendants. 186 F.Supp. 830.
 
 
 4
 By per curiam opinion and order dated June 7, 1960, this court, on defendants' motion to grant a full stay of the district court's order granted a partial stay. We interpreted the order made below as requiring a complete liquidation by the receiver of the defendant corporations. We stayed that order for complete liquidation so that defendants, who had appealed the entire judgment, would not, if successful on their appeal, gain a Pyrrhic victory. We ordered the receiver 'to maintain, preserve, and conserve the assets' pending the determination of this appeal.
 
 
 5
 Thereafter, on June 9, 1960, when appellants sought clarification of our order of June 7, 1960, we referred them to the district court for 'interpretation or enforcement' of the court's orders, 'together with all details of administration,' pending the determination of the second appeal.
 
 
 6
 Subsequently, on July 6, 1960, the receiver petitioned us for authority to 'accomplish orderly liquidation' and bring the third corporate defendant (Trust Deed & Mortgage Exchange) within the provisions of the district court's orders. This petition was denied (without prejudice), because we did not desire to establish 'the law of the case' without a full scale hearing of all issues which were to be raised on appeal. We refer to and incorporate by reference our opinion and order in this regard, filed July 14, 1960 (No. 16995, unreported).
 
 
 7
 The jurisdiction of the court below rests upon section 22(a) of the Securities Act of 1933 (15 U.S.C.A. 77v(a) as to three counts, and upon section 27 of the Securities Exchange Act of 1934 (15 U.S.C.A. 78aa) as to two counts. This reliance by the government on such statutes assumes that the subject of the SEC's attack herein is 'a security.' This assumption is disputed by appellants, and is the principal issue on this appeal, of which this court has jurisdiction. 28 U.S.C. 1291.
 
 
 8
 This case comes before us on a large record. The findings are printed, and allegedly contain 42,000 words. The judgment, likewise printed, consists of some 5,000 words. The transcript of testimony covers thirty-nine days of trial, and some 3,600 typewritten pages, exclusive of hundreds of exhibits. We cannot attempt to cover the facts in this opinion. Suffice it to say, the appellants insist they are engaged in selling to the public what they maintain are individual trust deeds or mortgages, and what the SEC maintains constitutes an investment plan or contract, designated and commonly known as the 'Secured 10% Earnings Program.' Apparently some 9,000 investors have committed some forty million dollars to appellants' care.
 
 
 9
 There are five questions raised in this case:
 
 
 10
 I. Are appellants selling securities?
 
 
 11
 II. If they are, are appellants guilty of violations of the securities laws hereinabove mentioned?
 
 
 12
 III. Did the appellants have a fair trial of the issues, or was the trial judge prejudiced?
 
 
 13
 IV. Did the court below err in its rulings with respect to the admission of evidence?
 
 
 14
 V. Did the court below have jurisdiction (a) to appoint a receiver, and (b) go order liquidation?
 
 
 15
 We discuss each issue in turn.
 
 
 16
 I. Was that which was sold a security within the Act? 15 U.S.C.A. 77b(1), 2(1) of the Act.
 
 
 17
 The SEC contends that the sale here, through the 'Secured 10% Earnings Program' constituted more than a simple sale of second trust deeds-- an interest in real property; that what was really offered here was an investment contract. Under section 2 of the Securities Act, an 'investment contract' is specifically mentioned as a 'security' subject to the regulatory provisions of the Act.
 
 
 18
 Two Supreme Court cases must guide us in solving this problem. In S.E.C. v. C. M. Joiner Leasing Corp., 1943, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88, both the district court and the court of appeals had previously construed 5(a) and 17(a)(2) and (3) of the Securities Act so as to exclude from its operation trading in oil and gas leases. Investors purchased assignments of oil leases on small parcels of land; the underlying leases containing an agreement that lessees would drill a test well located somewhere in the large tract. Defendant Joiner agreed to drill the well, and financed its cost by the sale of these small leasehold assignments to 'investors' or 'purchasers.' The following facts were deemed significant by the Supreme Court:
 
 
 19
 (1) Sales literature nowhere mentioned the drilling conditions a purchaser would meet, or costs the purchaser would incur, if he attempted to drill his own acreage.
 
 
 20
 (2) Joiner promised to complete the test well, which would constitute a test applicable to all leaseholds sold in common.
 
 
 21
 (3) The advertising literature emphasized the character of the purchase as an investment, and as a participation in an enterprise.
 
 
 22
 (4) The leasehold interests were described as 'securities * * * believed exempted from registration with * * * the Securities and Exchange Commission.' Id., 320 U.S. at page 347, 64 S.Ct. at page 121.
 
 
 23
 The Supreme Court disagreed with both lower courts, and held that the 'defendants were not, as a practical matter offering naked leasehold rights.' The 'economic inducement' that Joiner would drill a well, 'runs through the whole transaction as the thread on which everybody's beads were strung.' Id. 320 U.S. at page 348, 64 S.Ct. at page 122. This was 'a form of investment contract in which the purchaser was paying both for a lease and for a development project.' Id. 320 U.S. at page 349, 64 S.Ct. at page 122.
 
 
 24
 Instruments may be included within the term 'securities' as defined in the Act, 'if on their face they answer to the name or description,'[2] but:'The reach of the Act does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved as matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as 'investment contractors', or as 'any interest or instrument commonly knows a 'security'.'
 
 
 25
 'The test rather is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect. In the enforcement of an act such as this it is not inappropriate that promoters' offerings be judged as being what they were represented to be.' Id. 320 U.S. at pages 351, 352-353, 64 S.Ct. at page 124.
 
 
 26
 The Supreme Court thereupon granted the SEC an injunction restraining respondents spondents from further violations of certain sections of the Act.
 
 
 27
 The second Supreme Court case is S.E.C. v. W. J. Howey Co., 1946, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244. Investors there also had purchased an interest in real property-- a unit of acreage in a citrus grove owned by one defendant. Investors were encouraged to, and most, but not all, of them did enter into a service agreement with a second companion corporation, whereby it was agreed that the management and control of the citrus acreage was in the service company's hands exclusively-- 'full and complete possession.' The annual return to each investor was an allocation of percentage profits based on the sale of all the product of the entire orange grove.
 
 
 28
 Again the district court refused to grant the injunction requested by the SEC, and the court of appeals (Fifth Circuit) affirmed the refusal. This, because both courts looked upon the transaction as two severable contractual relationships-- one with Howey Co. to buy land only, and one with 'Howey In The Hill's Service, Inc.' to supervise and service the growing crops, and no more.
 
 
 29
 The Supreme Court reversed, holding the transactions in the Howey case 'clearly' involve investment contracts as defined in the Act. 'All the elements of a profit-seeking business venture are present here. * * * The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.' Id. 328 U.S. at pages 300, 301, 66 S.Ct. at page 1104.
 
 
 30
 We are likewise referred to the following cases: cf. also: Penfield Co. v. S.E.C., 9 Cir., 1944, 143 F.2d 746, 154 A.L.R. 1027; Atherton v. United States, 9 Cir., 1942, 128 F.2d 463; S.E.C. v. Univ. Service Ass'n, 7 Cir., 1939, 106 F.2d 232; S.E.C. v. Crude Oil Corp., 7 Cir., 1937, 93 F.2d 844 (barrels of iol); S.E.C. v. Bourbon Sales Corp., D.C.W.D.Ky., 1942, 47 F.Supp. 70; S.E.C. v. Bailey, D.C.S.D.Fla., 1941, 41 F.Supp. 647 (land bearing tung trees); S.E.C. v. Payne, D.C.S.D.N.Y., 1940, 35 F.Supp. 873 (silver foxes); S.E.C. v. Pyne, D.C.Mass., 1940, 33 F.Supp. 988; S.E.C. v. Tung Corp., D.C.N.D.Ill., 1940, 32 F.Supp. 371 (and bearing tung trees); S.E.C. v. Timetrust, Inc., D.C.N.D.Cal., 1939, 28 F.Supp. 34; S.E.C. v. Wickham, D.C.Minn., 1935, 12 F.Supp. 245; Prohaska v. Hemmer et al., 1930, 256 Ill.App. 331 (land payable from crops raised by vendor); Holloway v. Thompson, 1942, 112 Ind.App. 229, 42 N.E.2d 421 (cemetery lots); Kerst v. Nelson, 1927, 171 Minn. 191, 213 N.W. 904, 54 A.L.R. 495 (land); Matter of Waldstein, 1936, 160 Misc. 763, 291 N.Y.S. 697 (cemetery lots).
 
 
 31
 Thus Howey adds the test of common enterprise to the Joiner test of results dependent on the efforts of one other than the purchaser.
 
 
 32
 Appellants argue that the test of Howey, as it modifies Joiner, is not discovered in the facts of this case; that the choice of the trust deeds was solely within the discretion and judgment of the purchaser; that each purchaser had an absolute right of rejection for any reason whatever within five days after designation by the appellants; that the supervision and other extra services offered are only in the nature of an accommodation, and are not an inherent or essential part of the thing that is sold-- namely, 'a trust deed on specific real estate.'
 
 
 33
 We ask ourselves the question: Is the investor led to expect profits solely from the efforts of one or more defendants arising from a common enterprise?
 
 
 34
 Howey, supra, teaches us that the statutory policy in the mind of the Congress in passing SEC regulations to afford 'broad protection to investors is not to be thwarted by unrealistic and irrelevant formulae.' Id. 328 U.S. at page 301, 66 S.Ct. at page 1104. And we are admonished to judge 'that promoters' offerings * * * as being what they were represented to be.' S.E.C. v. Joiner, supra, 320 U.S. at page 353, 64 S.Ct. 124.
 
 
 35
 With these instructions in mind, we have examined the evidence. Very few persons, particularly those unskilled in financial matters, could read the advertising of the appellants without coming to the firm conclusion that by sending moneys to the appellants they would receive far more than a note secured by a second mortgage or deed of trust on specific real estate.
 
 
 36
 (a) In the first place, many of the purchasers never saw the deed of trust they purchased, or the real property by which it was secured. In many, but not all, cases no physical delivery was made. Purchasers were assured that it was the company's policy to repurchase any delinquent trust deed, so that the purchaser would suffer no loss if he had be chance purchased one that later defaulted. A reserve to protect the Los Angeles Trust Deed & Mortgage Exchange from any loss by reason of such a repurchase was set up by appellants.
 
 
 37
 (b) The purchaser was encouraged to rely on the skill and knowledge of the appellants' officers, who were reported to deeds. Customers paid into 'accounts.' deeds. Customers paid into 'accounts.' They were encouraged to instruct the Los Angeles Trust Deed & Mortgage Exchange to 'collect and service the notes purchased * * * to record title in the name of the Los Angeles Trust Deed & Mortgage Exchange as Trustee * * *'; to authorize LATD 'to place notes in our portfolio'; to apply all principal and interest received to paying off additional purchases. In all this there was reliance on the appellants; an anticipated common effort.
 
 
 38
 (c) Plaintiff's Exhibit 30-A and Defendants' Exhibit D were copies of the booklet or brochure published in December 1957, which induced many of appellants' customers to pay money into 'accounts.' A casual reading of such booklet discloses that investors were assured of many things beyond the representations usually made to investors in securities. Some of of these appear in the margin.[3] Other, and earlier pamphlets or brochures, disclose many of the same representations. It is true changes were made in such representations. Instead of the phrase 'Our 10% Earnings Program,' used in 1958, the phrase originally used was 'Your Secured 10% Earnings Account.' 'How to begin your program' in December 1957, became 'How to open your account' in the July 1958 brochure, which became 'How to start earning a secured 10%' in July 1959.
 
 
 39
 In a simple 'throw away' printed in 1957, the following appears:
 
 
 40
 (1) 'Your money (even small amounts) keeps working for you all the time.'
 
 
 41
 (2) 'Your investment earns a 10% Income.'
 
 
 42
 (3) 'Collection of your income and servicing of your account are all handled by us.'
 
 
 43
 (4) 'Our selections are made to fit your program, your needs.'
 
 
 44
 In considering such representations made by the LATD after 1957, we note only in passing the earlier pamphlets and brochures, where the appellant firms are characterized as 'investment bankers * * * specializing in Real Estate Securities,' and the advertising referring to 'investment securities.' Such representations, we understand, were not made in later brochures and pamphlets.
 
 
 45
 (d) In addition to the foregoing, there appear instances in the record where trust deeds 'sold' to investors' accounts were 'repurchased' by the appellants, in order that one or more appellant corporations could profit from the proposed accelerated payment of principal. These accelerated payments were indicated to the Trustee and known to the appellants, but such knowledge was not communicated to the 'purchaser,' nor was the 'purchaser' given the profit on such payment in full before maturity. Profit was taken by the appellant corporations. Appellants urge that this was done by mistake-- admitting by such defense that appellants' actions in some instances, at least, fly in the face of any attempt to characterize appellants' sales as individual and ordinary sales of specific trust deeds. Appellants also urge that the taking of such 'windfall' profits occurred so seldom it is unfair to include such incidents within the pattern of appellants' actions. We cannot agree.[4] We do not know what percentage of the total trust deeds sold by appellants were paid off prior to maturity, and of them, how many were repurchased by appellants. We are satisfied, however, that they were a substantial, if not a large, number and sufficient instances were proved from which there could be established by inference a designed pattern of conduct.
 
 
 46
 (e) Repeated representations were made to prospective 'purchasers' by both brochure and newspaper advertisements that 'accounts opened by the 20th * * * or additions received by the 20th * * * earn from the 1st.'
 
 
 47
 This was accomplished, at least in some instances, where the purchasers' funds had remained univested for some time by the appellants introducing the trust deed note into the account at an arbitrary price which would reflect earnings at ten per cent from the date the purchasers' funds were received. This could be profitably done, of course, only where the purchase price to the 'investor' bore no relationship to the price of the discounted note theretofore paid by appellants. The trust deed notes were purchased by appellants at discounts. Prices ranged from fifty-five per cent of the face amount on up to eighty or ninety per cent, or (at times, if the note bore on its face ten per cent interest) to one hundred per cent. The great majority were purchased at discounts of twenty to forty per cent. The price above the discount at which the notes were sold to purchasers varied dependent on the face amount, the rate of interest, the amount of monthly payment and the maturity date, all calculated to net ten per cent if held to maturity.
 
 
 48
 (f) There appears in evidence a memorandum dated May 29, 1959, which is illuminating as to the appellants' procedures with respect to such interest payments. The first two paragraphs read as follows:
 
 
 49
 'As you realize, it has been the policy of the company in the past to accept funds from a customer for the purchase of trust deeds, and prior to actual assignment and ownership of a trust deed by a customer, to make an advance of the projected earnings, so that the customer could receive a check on the first of the month, after he had made his funds available.
 
 
 50
 'In view of the fact that this might possibly be construed as a payment of interest, instead of a mere advance against future earnings, which is charged against the free credit balance of the customer, it shall be the policy of the company to forward earnings checks to each customer only after a trust deed has been confirmed to the customer, and not rejected.'
 
 
 51
 All the foregoing, together with the 'Reserve for Losses' (Findings VII B, paras. 1-4) hereinbefore mentioned, requires us to hold that the appellants LATD and TD&MM have, by their representations made to the public, created and constituted the second trust deed notes herein considered securities subject to the provisions of the Securities Act. We find 'a common enterprise' in which the appellants and the purchasers of second trust deed notes have an economic interest. We find that the economic welfare of the purchasers is inextricably woven with the ability of LATD to locate by the exercise of its independent judgment a sufficient number of discounted trust deeds, and the ability of LATD to subsequently meet its commitments, to check, evaluate, supervise, and supersede. Eighty-five per cent of the 'accounts' of the investors are in 'debit balance.' This means the eighty-five per cent of the investors or purchasers are making monthly deposits with LATD, or are having LATD apply collections on trust deed notes owned by purchasers to the purchase of a new trust deed note. Title to such trust deeds is retained in LATD. The court below found, and we connot hold it clearly erroneous, that
 
 
 52
 'investors * * * (were) 'led to expect' the promised 10% Earnings solely on the basis of the continued ability of LATD to select, screen, appraise and acquire suitable trust deed notes, to service and collect the loan, and, if necessary, to handle foreclosure thereof, and if required by the investor, to repurchase or arrange for the resale of the obligation. There is an implied guarantee against loss * * *' (Finding XIII, P2, p. 45.)
 
 
 53
 The terms of the offer, the plan of distribution, the economic inducements held out to the prospects, the results dependent on one other than the purchaser, the common enterprise, all combine herein to make the second trust deed notes 'securities,' as that term has been defined by the Supreme Court.
 
 II. Violation of Securities Law
 
 54
 We need spend little time on the second question. If that which was here sold were securities, appellants were guilty of violations of the laws applicable to such securities. Admittedly such securities have not been registered with the SEC under the Securities Act, and neither LATD, TD&ME, nor TD&MM has, or is, registered as a broker or dealer in securities under the Securities Exchange Act. Admittedly the United States mails were used to sell such securities.
 
 III. Fair Trial
 
 55
 Appellants urge that they were denied a fair trial, and that the trial judge was prejudiced against the appellants.
 
 
 56
 (A) We have carefully read the record in regard to this charge. That there was a clash of personalities between appellants' counsel and the trial court is obvious. That the case was long and difficult, and was required to be sandwiched in between other cases already in trial or thereafter reached for trial is likewise apparent.
 
 
 57
 We first consider the charge that the trial judge should have disqualified himself under the provisions of 28 U.S.C. 144. We find such charge to be without merit because of the following:
 
 
 58
 That the trial court required the to disqualify refer to five incidents. These incidents are--
 
 
 59
 (1) That the trial court required the appellants to attend a night session from 7:00 to 9:00 P.M. on November 4, 1958;
 
 
 60
 (2) That the trial court refused to grant a stay of the taking over by the Receiver it appointed on November 7, 1958;
 
 
 61
 (3) That the trial court, in appointing such Receiver and issuing a preliminary injunction on November 7, 1958, failed to follow local Rule 7 of the United States District Court for the Southern District, requiring service of documents on opposing counsel 'unless the Court otherwise directs';
 
 
 62
 (4) That the trial court failed to follow local Rule 7 of that court on November 10, 1958, with respect to the proposed settlement of the findings of fact, etc., and shortened time of notice thereof;(5) That on March 15, 1959, after the reversal by this court of the original decision, and upon the suggestion of appellants' counsel that the trial judge might desire to transfer the case for its retrial to another judge, he refused to do so, and expressed 'with emotion and anger * * * that he was not a coward, was not running away from his duties,' and that if appellants believed him to be biased or prejudiced, if they would file their affidavits, he would file counter-affidavits, and the matter would be sent to the Presiding Judge of the Central Division of the Southern District of the United States District Court for California to determine the matter of his disqualification.
 
 
 63
 The first two incidents relate to matters entirely within the discretion of any trial judge. The next two incidents, at worst, indicate a mistake in law. The fifth, except for affiant's conclusion that the trial judge spoke with emotion and anger, indicates that the trial judge spoke and acted as he was required to do under the rules of that court, the case law, the canons of judicial ethics, and good common sense.
 
 
 64
 When appellants contend, as they do here, that these 'affidavits charging bias and prejudice were legally adequate and sufficient * * * to require the trial judge to disqualify himself,' they simply make an incorrect statement of the law. Appellants cite but two cases in support of their position that the affidavits, as a matter of law, required disqualification. Neither is in point on its facts. Cf. Connelly v. U.S. District Court, 9 Cir., 1951, 191 F.2d 692,[5] and Gladstein v. McLaughlin, 9 Cir., 1955, 230 F.2d 762.[6]
 
 
 65
 We find in the affidavits no evidence of bias in the personal sense contemplated and required by the statute. Eisler v. United States, 1948, 83 U.S. App.D.C. 315, 170 F.2d 273, 278. And see: Loew's Inc. v. Cole, 9 Cir., 1950, 185 F.2d 641, 646; Cole v. Loew's, D.C., 76 F.Supp. 872; Foster v. Medina, 2 Cir., 1948, 170 F.2d 632; Price v. Johnson, 9 Cir., 1942, 125 F.2d 806, 811.
 
 
 66
 (B) Appellants urge that since the filing of the first affidavit, and the trial judge's refusal to disqualify himself, he has again evidenced bias and prejudice. Reference is first made to an affidavit referred to in, and ordered sealed by, our order of July 14, 1960. This affidavit, if the facts therein stated are true, indicates judicial temper and lack of judicial restraint, but it is expressed as to one of appellants' attorneys, not to all, and not to any party or its officers. So far as the record shows, no new motion to disqualify the trial judge was made below. While admittedly the statements charged by the trial judge, if true, even though not made in open court but at an informal conference in chambers, would have been better left unsaid, yet we cannot say such statements as a matter of law prevented a fair trial to the appellants in view of the plethora of evidence presented to us by the record herein which fully generally supports the court's findings and judgment.
 
 
 67
 (C) Appellants next seek to bolster the evidence of alleged bias and prejudice by urging that irrelevant and immaterial documents prejudicial to appellants' case were admitted. Here again, the admissibility of such documents lies largely within the discretion of the trial court. That is particularly true in a case of this kind, where conflicting theories of what is and is not admissible were advanced by trial counsel. The one hundred and three documents listed in Appendix I attached to the brief of 'certain appellants, including LATD&ME,' seem all related to transactions in which some one or more of the corporate or individual defendants participated, and which related to the production of the securities here considered. Joint venture agreements, title policies, maps, brochures, income tax estimates, television scripts, and advertisements were all background to, if not strictly relevant and material to, the charges here made. The material could conceivably have aided the court in its attempt to understand a difficult and involved factual situation. The principal objection to many of the items in evidence is that they relate to matters occurring after the filing of the amended complaint. As we see it, such rulings, if technically in error (which we do not and need not here pass upon), would not necessarily constitute prejudicial error requiring reversal.
 
 
 68
 (D) Appellants' fourth charge of prejudice relates to the trial judge's alleged 'severe, arbitrary and threatening conduct toward appellants' witnesses and counsel, and by contrast his courteous deference to S.E.C. witnesses and counsel.'
 
 
 69
 Appellants' Appendix IV quotes those portions of the testimony wherein such a charge is allegedly supported. Appendix IV contains fifteen pages out of some 3,623 contained in the transcript. These fifteen pages refer to five incidents.
 
 
 70
 (1) In the first incident (November 3, 1959), Mr. Cuthbertson, one counsel for appellants, admitted to having made 'a sarcastic remark' while opposing counsel was addressing the court. Upon being reprimanded by the court, Mr. Cuthbertson stated: 'I am sorry.' He should have been.
 
 
 71
 (2) In the second incident (November 18, 1959), Mr. Cuthbertson again interrupted the cross-examination of a defendant, telling him, 'I think you have answered the question, Mr. Farrell.' The court reprimanded Mr. Cuthbertson for so interrupting (but expressly excluded any reprimand of Mr. Foley or Mr. Ryan, other counsel for certain defendants). He advised Mr. Cuthbertson: 'This court is going to run this court as a court of law and obey the rules, and, Mr. Cuthbertson, you are going to have to find that out sooner or later.'
 
 
 72
 (3) In the third incident on December 10, 1959, a witness evaded a direct answer to several questions by the counsel for the SEC. After an interruption by Mr. Cuthbertson (with an interpretation of the questioning, which may or may not have suggested an answer to the witness (Appendix IV, p. 8, lines 9-11)), Mr. Kennamer, counsel for SEC, referred to the 'coaching' and 'signaling' of witnesses he had brought before the court as hostile witnesses. The trial judge rejected the charge of 'signals,' accepted the charge of 'coaching,' and threatened certain counsel with 'some punitive measure.'[7] The record fails to show that any such punitive measure was formally taken.
 
 
 73
 (4) The fourth incident, on December 11, 1959, was entirely innocuous, proving nothing.
 
 
 74
 (5) The fifth incident, on December 15, 1959, relates to an attempt by the SEC to discover who wrote an article published in the March 1959 issue of 'Topics,' the publication of the LATD, interpretint this court's opinion in the previous appeal.[8] Mr. Cuthbertson refused to take the responsibility for the article, although admittedly being present with three appellants and officers of LATD, David Farrell, O. J. Farrell and Thomas Wolfe, whose joint 'product' it was. The court expressed himself as 'shocked,' and added: 'I want that put in the record. * * * Especially shocked because Mr. Cuthbertson at one time was attorney for the SEC.'
 
 
 75
 We see nothing in these five incidents recited that even suggests any improper attitude, ruling or action on the part of the trial judge, nor any 'severe, arbitrary or threatening' conduct toward appellants or their counsel. We see courtesy but no deference to counsel for the SEC.
 
 
 76
 The incident occurring on April 21, 1960, in chambers, has heretofore been discussed.
 
 
 77
 (E) Appellants' fifth charge of bias and prejudice relates to rulings made as a result of discovery proceedings. If erroneous as matters of law, and if they constitute prejudicial error, they can be corrected on appeal. The dispute between the parties rests upon diverse interpretations of the court's various orders, and what they required of the appellants in the way of production of documents, and the extent of the cooperation required of its agents and employees. Appellants, after furnishing certain information to the SEC representative, refused to furnish additional information. The SEC sought to obtain sanctions against the appellants under Rule 37(b) (Fed.R.Civ.P.), 28 U.S.C. in retaliation for such refusal. The SEC sought to prevent appellants from introducing evidence, and to strike appellants' answer.
 
 
 78
 We glean from the record that 'an order was made on October 5th granting the Commission's motion under Rule 37(b),' and directing the Commission 'to lodge a definitive order.' This was done on October 9th, and an 'in final form' order (dated October 12, 1959) was made by the trial court. Reference is made to that document in the Transcript of Record, pages 297 to 303. Its bulk weighs against its inclusion in this opinion. It suffices here to say it granted generally the relief sought by the SEC by its motion, under Rule 37(b), i.e., it ordered certain facts urged by the SEC 'to be taken as established;' it forbade appellants 'to oppose, by introduction of testimony or otherwise, the claims' of the SEC, or to support their defenses, or to introduce into evidence 'any of the books, records, etc.' described in Schedule A attached to the motion of the SEC to which appellants had denied the SEC investigators access. It also struck certain material portions of the appellants' answer.
 
 
 79
 Appellants, under date of October 22, 1959, objected to the court's action in granting the SEC's motion under Rule 37(b), and on October 23, 1959, the court filed a long memorandum and order granting appellants' motion to vacate the orders previously made under Rule 37(b). This is again too bulky to include herein in full.
 
 
 80
 Such latter action of the trial court, far from showing bias and prejudice, indicated a desire to follow the law; to correct any error involved in the making of the original order, if one had been made; and to permit the appellants to have a fair trial. The record shows that between October 5th and October 23rd, 1959, there were six days of trial-- October 6th, 7th, 8th, 13th, 20th and 22nd. No testimony was taken on the 13th, 20th or 22nd. On the other days the court heard appellee's witnesses, Aidel Korenberg, an investor, James West, Jr., an investor, and Stanley C. Marks, a defendant and adverse witness called by the SEC.
 
 
 81
 At no time during the giving of testimony on the 6th, 7th or 8th of October 1959, can we find any recognition by either the court or any counsel that any attorney or any party was laboring under any disability created by the October 5, 1959, order. If counsel for the appellants knew of it, they did not mention it. Instead they requested and obtained a suspension of the trial (to which the triai court readily assented) until they could apply to this court for a writ.
 
 
 82
 I? we assume there was error int he October 5th (or 9th, or 12th) order made by the trial judge, such error was corrected by his order of October 22, 1959. And we find no prejudice existed with respect to appellants, because in no way or instance were they prevented during the short-lived existence of the Rule 37 (b) order from participating fully in the trial. They offered no evidence (inasmuch as the appellee's case was going in at that time) and hence none was refused. We can find no personal bias or prejudice against appellants with respect to the Rule 37(b) order, nor in the circumstances surrounding its creation and termination.
 
 
 83
 (F) Appellants' sixth, seventh and eighth charges of bias and prejudice (discussed collectively by appellants) relate to the trial court's action in three instances of either allegedly signing papers presented by the SEC during the trial without giving the appellants proper notice, or acting sua sponte on various matters. Fed.R.Civ.P. 5(a), 6(b), 43(e) and Rules 3(b), 3(d), 7(a) and 18(a) of the Rules of the Unites States District Court, Southern District of California, West's Ann.Code.
 
 
 84
 While we cannot condone the several instances where matters were heard on shortened notice without order shortening time having been previously made, we fail to note any instance wherein appellants were denied additional time to prepare for such hearings when they requested it. No claim is made that any specific order or ruling was error, but that in the aggregate such actions showed bias and prejudice. We do not believe a thorough reading of the record substantiates such a position. We have been referred to no errors in procedure which in any sense could be ruled to constitute prejudicial error. The court did nothing in shortening time it could not have done had a request and order been made shortening time, as the rules permit. Cf. Alexander & Co. v. Martz, 1930, 107 Cal.App. 277, 279, 290 P. 300.
 
 
 85
 ( G) The ninth ground of alleged bias and prejudice is that Messrs. Cuthbertson and Foley were prohibited by court order from participating in the trial on October 6th, 7th, 8th and 13th, 1959. If such a specific order was made, it was apparently never enforced.
 
 
 86
 As we have seen, no testimony was taken on October 13th, 1959. But at that short hearing, Mr. Cuthbertson spoke five times and Mr. Foley seven. The trial judge indicated his willingness to grant a stay requested by appellants, but instead suspended the trial until the matter then pending in this court could be heard.
 
 
 87
 On October 6th, 1959, Mr. Foley first spoke to the court at some length (Rep. tr. Vol. I, pp. 4-14), and thereafter made an opening statement (Rep. tr. Vol. I, pp. 16-32). Mr. Cuthbertson then spoke (Rep. tr. Vol. I, pp. 34-40). Thereafter, the first witness, Stanley C. Marks, was called and testified. Mr. Foley objected more than once to the receipt of documents in evidence. Mr. Cuthbertson joined in voicing objections. Both counsel were granted a continuing objection to all matters relating to dates following the filing of the amended complaint. Several of Mr. Foley's objections were sustained, both as to the form of the questions, and on the substantive law of privilege. All this occurred before the noon recess. Thereafter both Mr. Foley and Mr. Cuthbertson participated in the defense. When Mr. Foley made no objection as such, but stated: 'I would like to have the question (of Mr. Kennamer) rephrased,'-- the trial judge granted Mr. Foley's request, and required counsel for the SEC to reframe the question. At one point the court delayed the hearing while Mr. Foley was on telephone.
 
 
 88
 On October 7th, 1959, the same procedure appears to have been followed. Both Mr. Cuthbertson and Mr. Foley cross-examined the witness, Mrs. Korenberg, at some length.
 
 
 89
 On October 8th, 1959, both Mr. Foley and Mr. Cuthbertson again participated in the trial proceeding, and cross-examined at some length the witness West.
 
 
 90
 We are at a loss to see how, under such circumstances, appellants can charge they 'were made spectators.' There is no truth and nomerit whatsoever in such an assignment of alleged error.
 
 
 91
 (H) Appellants' tenth assignment of bias and prejudice (marked No. 11 in their brief) is the charge that 'the adjudication against the appellants was made before the trial began and before any evidence had been received in the case.' This charge rests on appellants' conclusion that because the final judgment and findings are similar to the recitals contained in Schedule B attached to the motion made by the SEC to obtain an order pursuant to Rule 37(b) that 'Certain facts claimed by the Securities and Exchange Commission shall be taken as established.' Another second logical explanation would be that the evidence produced at the trial proved the SEC's case in all respects. Identity of language between what a litigant claims prior to trial and what the court finds as a fact after trial is no proof whatsoever that the trial judge pre-judged the facts; or had made any decision prior to the completion of all testimony and the closing of the case.
 
 
 92
 In concluding our observations on whether or not appellants have had a fair trial, we can only say that a reading of the transcript of a long and protracted trial has convinced this court that they have had. We find no deprivation of property without due process of law.
 
 IV. Errors in the Admission of Evidence
 
 93
 In but one instance does the brie? of appellants represented by Mr. Cuthbertson challenge the rejection of evidence. That related to the witness West. The question was asked on cross-examination:
 
 
 94
 'Will you examine that brochure and point out to me, if you can, anything in that brochure which indicates that the company as such would pay any interest or earnings to its customers, other than such as might be earned on trust deeds sold to the customers?'
 
 
 95
 Objection was made, and sustained. The objection was made on the grounds that the question was argumentative, and unfair to the witness. A better objection would have been that the brochure (Plaintiff's Exhibit 32) was already in evidence, spoke for itself, and was itself better evidence of what was contained therein than any conclusion of the witness on that subject. Perhaps counsel for the SEC would have raised such a ground, had he not been interrupted by the court's ruling in his favor. But in any event, the rejection of evidence, if clearly inadmissible on any ground whether urged or not, is not prejudicial error.
 
 
 96
 Counsel states that Mr. West was contending that he believed himself entitled to interest. That is correct. But Mr. West had also testified he had been told by Mr. Stark, the appellant LATD's vice president, that he would receive principal and interest every month.
 
 
 97
 'Only if you deposited $3,000 or more would we remit the principal and interest to you that you can accumulate. Every month we will send you a confirmation sheet showing you the accumulation of your investment.'
 
 
 98
 When West paid defendant $2,500 on the 21st of November, 1958, Mr. Stark promised to pay him interest 'from the first of the month.' West received a confirmation of a sale of a first trust deed on December 31, 1958. This he rejected. He received another dated March 16, 1959, which was again rejected by him. A third confirmation of sale, dated June 1, 1959, West also rejected. West then demanded the return of his $2,500, and received it. He then asked for his interest, and he was told that not having made a purchase of any deed of trust, he was not entitled to any interest, and this because 'it was against the law.'
 
 
 99
 West told Stark that 'his (West's) monthly statements (received from appellants, Plaintiff's Ex. 17) showed an increase in earnings and this is what he (West) should receive.'[9] West had received a photostatic copy of his master ledger card. That master ledger card appears in evidence (Plaintiffs Ex. 18).[10]
 
 
 100
 In view of the oral representations allegedly made to Mr. West by appellants' representative,[11] and the written documents hereinabove mentioned and introduced into evidence, the question as to what West's interpretation of the language contained in the brochure (Plaintiff's Ex. 32) may have been adds little to the proof of this case. We hold the court's ruling sustaining the objection to the question with respect to Exhibit 32 was not error, and by no manner of thinking could it be deemed prejudicial error.
 
 V. The Appointment of a Receiver
 
 101
 We next come to the most difficult point in this appeal, the appointment of the Receiver with instructions to liquidate the corporate appellants.
 
 
 102
 The SEC is not an interested party to this litigation in the sense that it has any financial interest in how the appellant corporations are operated. No dissatisfied customer or investor is a party plaintiff. The SEC must therefore first look to the statutory authority given it by its creator, the Congress.
 
 
 103
 Title 15 U.S.C.A. 77a to 77aa covers the issuance of Domestic Securities. Section 77b first defines 'security,' and as we have heretofore determined, what appellants here sold constitutes a security-- the equivalent of an 'investment contract,' for want of a better classification. Section 77e makes it unlawful for any person to use the mails to sell any unregistered security through the use of any prospectus. It was here stipulated by all appellants that the mails had been used by appellants. Section 77l creates for a violation of 77e a civil liability in favor of the person purchasing the security. As we have seen, no such person appears herein as a party. Section 77s authorizes the Commission to make necessary rules and regulations, and to carry out investigations. Section 77t(b) authorizes the Commission to bring an action 'to enjoin such acts or practices' as are deemed a violation of the provisions of subchapter I, relating to Domestic Securities-- 'and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond.'
 
 Also, 77t(c) provides:
 
 104
 'Upon application of the Commission the district courts of the United States and the United States courts of any territory, * * * shall also have jurisdiction to issue writs of mandamus commanding any person to comply with the provisions of this subchapter or any order of the Commission made in pursuance thereof.'
 
 
 105
 Thus, we see that 15 U.S.C.A. 77t(b) (and the substantially identical 21(e) of the Securities Exchange Act of 1934 (15 U.S.C.A. 78u(e)) is the basis of the authority for the SEC's suit herein.
 
 
 106
 In view of our holding that that which was sold by appellants herein constituted a security; that the district court trial judge was under no duty to disqualify himself; that he was not prejudiced nor biased against appellants personally; that the appellants were guilty of violations of the Securities Act of 1933 and the various Secrities Exchange Act provisions described in said judgment; that the appellants had a fair trial; and, that there was no error in the admission of evidence, as charged, we have no doubt as to the authority of the SEC to obtain the restraining orders and injunctions set forth in parts I to V, inclusive, of the judgment heretofore entered, and appealed from herein, or other necessary writs to require compliance with the Securities and Securities Exchange Acts.
 
 
 107
 This brings us to the question as to whether the court below had authority to appoint a Receiver of LATD and TD & MM.
 
 
 108
 The sale of any securities without the approval of the SEC, provided they are sold in interstate commerce, or by use of the United States mails, is per se unlawful. In addition, there is sufficient evidence in the record to support the trial court's findings of fact and conclusions of law that the appellants are guilty of unlawful and deceitful and fraudulent acts.
 
 
 109
 There can be no question, for example, that the replacing of defaulted mortgages sold to investors from the 'warehouse account' would eventually, if not immediately, create serious problems as to the values attributed to such 'warehouse account.' The practice of valuing the repurchased second trust deeds, not at the price originally paid by appellants to the original makers, but at the revised and higher prices at which those discounted trust deeds were repurchased by the appellants from dissatisfied purchasers (frequently after the occurrence of a default in principal and interest payments), could only result in inflated, unrealistic, inaccurate and, at times, a fraudulent evaluation of the appellants' assets. It is unnecessary to mention again the various badges of fraud and deceit previously touched upon in this opinion.
 
 
 110
 We agree with appellee that under such circumstances it might well have been an abuse of discretion for the court below to have declined to grant a decree enjoining appellants from continued violations of the registration and anti- fraud provisions of the Securities Act. We need not reach any question of abuse of discretion, for the injunctive provisions were by statute provided for, to be exercised by the trial court in a proper case. And in passing upon whether the trial court acted within its judicial discretion, we must interpret every intendment in favor of the legality of the court's action.
 
 
 111
 Nor are we impressed with appellant's argument that they have reformed; that their latest brochures and advertisements have eliminated much that was originally put out, and which was admittedly either outright false, or inaccurate, or capable of an interpretation by unwary investors contrary to the actual facts.
 
 
 112
 'A trial court's wide discretion in fashioning remedies is not to be exercised to deny relief altogether by lightly inferring an abandonment of the unlawful activities from a cessation which seems timed to anticipate suit.' United States v. Parke Davis & Co., 1960, 362 U.S. 29, 48, 80 S.Ct. 503, 514, 4 L.E.2d 505. And cf: S.E.C. v. Culpepper, 2 Cir., 1959, 270 F.2d 241, 249.
 
 
 113
 Nor are we inclined to modify the scope of injunctive provisions with respect to the securities affected by the court's order. N.L.R.B. v. Express Publishing Co., 1941, 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930; Hillsborough Investment Corp. v. S.E.C., 1 Cir., 1960, 276 F.2d 665.
 
 
 114
 With respect to the authority of the trial court to appoint the Receiver to take over assets in order that they might not be dissipated, or wasted, and so that the status quo may be maintained, we are referred by appellee to Porter v. Warner Holding Co., 1946, 328 U.S. 395, 389, 66 S.Ct. 1086, 90 L.Ed. 1332; Mitchell v. Robert De Mario Jewelry, 1960, 361 U.S. 288, 291, 80 S.Ct. 332, 4 L.Ed.2d 323, as the cases upon which it principally relies. The first relates to the Emergency Price Control Act of 1942; the second to the enforcement of Fair Labor Standards Act, 29 U.S.C.A. 201 et seq. Neither is directly in point in a case of this kind, instituted under the Securities Exchange Act and the Securities Act, containing somewhat different language. Nevertheless, we conclude there exists under the latter acts the power and authority in the SEC to bring this action, and power in the district court, as a court of equity, to appoint a receiver to maintain in status quo the assets of the appellants and the respective purchasers of the second trust deeds until such time as the appellants can comply with the law, or dissatisfied trust deed holders or other creditors may take the necessary steps to prove by regular and ordinary methods that the several appellants are insolvent and/or unable to meet their obligations.
 
 
 115
 While this is apparently a case of near first impression in a federal appellate court, and the Supreme Court has not as yet had an opportunity to rule on the precise question here involved, the First Circuit has ruled that authority to appoint such a receiver exists in the court in an action instituted by the SEC, under the peculiar circumstances existing in that case, although totally dissimilar to those here existing. Aldred Investment Co. v. S.E.C., 1 Cir., 1945, 151 F.2d 254 and S.E.C. v. Fiscal Fund, Inc., D.Del., 1943, 48 F.Supp. 712. And we are referred by appellee to the following unreported cases; S.E.C. v. Willcox, N.D.Ind., 1935; S.E.C. v. Colonial Trading Co., N.D.Nev., 1935; S.E.C. v. Lubbe, S.D.Ill., 1943; S.E.C. v. Hempstead, D.C.R.I., 1944; S.E.C. v. Woodman, D.Mass., 1944; S.E.C. v. Adams, N.D.Ill., 1949; S.E.C. v. Barrett Herrick & Co., S.D.N.Y., Civil Action No. 112-936; S.E.C. v. Zippin & Co., N.D.Ill., No. 53C53; S.E.C. v. Investment Brokers of New Jersey, N.J., 1960; S.E.C. v. Arthur C. Costello E.D.Mo., 1960.
 
 
 116
 We seen no reason why the fact that the Securities Act establishes a right which an individual litigant may enforce necessarily strips the SEC from having similar rights as a litigant. Cf. Deckert v. Independent Shares Corp., 1940, 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189.
 
 
 117
 Nor are we convinced that because the SEC has asked for authority from the Congress to broaden its statutory powers, and that the Congress thus far has not seen it proper to do so, means that the broad equitable powers of the federal courts cannot encompass necessary ancillary relief, such as the appointment of a receiver, assuming the need for such exercise of ancillary power exists.
 
 
 118
 We conclude, therefore, as the Supreme Court has stated with respect to other regulatory statutes, that the Congress must be taken to have acted cognizant of the historic power of equity to provide complete relief in the light of statutory purposes. As the Supreme Court long ago recognized, there is inherent in the courts of equity a jurisdiction to give effect to the policy of the legislature. And see Riehle v. Margolies, 1929, 279 U.S. 218, 49 S.Ct. 310, 73 L.Ed. 669; Hornstein, A Remedy for Corporate Abuse, 40 Colum.L.Rev. 220, 224 (1940). View Crest Garden Apartments, Inc. v. United States, 9 Cir., 1960, 281 F. d 844, and cases cited in note 2; Totten v. Harlowe, 1937, 67 App.D.C. 132, 90 F.2d 377, 111 A.L.R. 726, Garden Homes v. United States, 1 Cir., 1952, 200 F.2d 299.
 
 
 119
 We next consider the power of the court to order the Receiver to liquidate the respective corporate defendants.
 
 
 120
 We are referred to no authority which authorizes the court to require the orderly or any liquidation by the Receiver of LATD, TD&MM, and/or TD&ME (if that corporation should hereafter be included within the receivership), when there has been no bankruptcy proceedings. The trustee in bankruptcy is the person to liquidate, if that be necessary, under the usual and ordinary supervision of a Referee in Bankruptcy.
 
 
 121
 The trial court has found insolvency in the bankruptcy sense, but there is no apparent reason here why the violation of the Securities Act and the Securities Exchange Act should lead to a different type of final liquidation than that which is had for the normal corporate bankrupt. In true bankruptcy, procedures are better geared for creditors and depositors to give them a day in court and protect their rights. Also, the Bankruptcy Act (11 U.S.C.A. 1 et seq.) has provisions for reorganization.
 
 
 122
 In our judgment the receiver here should be regarded as one pendente lite. Obviously, on motion of appellants, the district court should not release the appellants from the receivership until they have complied with the registration provisions of the Acts of Congress which they have offended.
 
 
 123
 It is appreciated that the conservator type of receivership which we have insisted upon is not well adapted to a business the very essence of which is promotion and, apparently, depends on a constant inflow of new business. However, a receiver does seem required. But, we are not yet willing to order liquidation. That would establish perhaps generally a special additional penalty for failure to comply with the two Acts of Congress with which we were here concerned and we doubt that this was within the contemplation of Congress. We do not hold that liquidation can not ever be effected. Possibly some circumstances might arise which would justify such a result. And, it could even eventuate in this case, but we hold 'not now.'
 
 
 124
 The judgment of the trial court is therefore modified by striking therefrom the words on page 838 beginning at line 30 of 186 F.Supp.:
 
 
 125
 'with directions to accomplish the orderly liquidation of Los Angeles Trust Deed & Mortgage Exchange and Trust Deed & Mortgage Markets.'
 
 
 126
 This is as it was heretofore modified by our previous stay order. In all other respects the judgment herein appealed from is affirmed, and the matter remanded to the district court for further proceedings in accordance with this opinion.
 
 
 
 [1]
 Los Angeles Trust Deed & Mortgage Exchange (herein sometimes referred to as LATD); Trust Deed & Mortgage Exchange (herein sometimes referred to as TD& ME); and, Trust Deed & Mortgage Markets (herein sometimes referred to as TD&MM)
 
 
 [2]
 Section 2(1) of the Act, 15 U.S.C.A. 77b(1), provides:
 'The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.'
 
 
 [3]
 It was represented by appellants to the public: (a) that 'your money (will be) earning a current 10%. We have carefully devised a controlled program to provide you with a current 10% Return on your funds and at the same time keep them individually secured.' (b) 'We emphasize that every attempt is made to see that your current 10% Earnings are maintained through continual reinvestment.' (c) 'The very best notes are carefully processed to determine the value of the property, 'whether the owner has a large cash equity;' if his credit and job are stable; whether the note is valid,' etc. 'All these points are checked and rechecked by experts in their particular fields with many years of experience.' (d) 'A note is then 'warehoused' until it either seasons or fits properly into the portfolio of a particular investor. It is then again checked carefully.' (e) 'Your money is protected through our bonded status.' (f) 'Upon receipt your money is deposited in a separate trust account for customers' money.' (g) 'You receive a certificate of registration and guarantee. * * *' (h) 'You can plan now your projected investment program.' (i) 'Should you desire to terminate your program, your funds plus accrued interest are immediately available upon liquidation of the notes in your account. * * * We have never failed to honor a request for liquidation. * * * Our policy is to do our best to protect the investor with every resource and intelligent principle at our command.' (j) 'We make no charge for reselling and there are no penalties or hidden charges or loss of interest in connection with termination of this program.' (k) '(Foreclosure) is a simple procedure, and of course, we would handle the details without additional cost.' (l) 'We notify you of such a default and give you an opportunity to foreclose the property yourself and make the extra profit if you so desire.' (m) 'The 'yield' on notes selected for your account is a full, firm return.' (n) 'Full coverage having resulted from investor telling investor or our many services * * * our firm has had the time and experience necessary to develop a completely coordinated system.' (o) 'The only legal difference between a first or second trust deed is the fact that one was recorded prior to the other.'
 
 
 [4]
 See Finding XI, B (2), p. 35, 'Printed Findings of Fact and Conclusion of Law Dated May 20, 1960.'
 Finding XI, 'Evidence of Fraud,' B 1 through B 12, reads as follows.
 'B. Manipulation of Investors' Accounts to Realize 'Windfall' Profits.
 '1. Although LATD represents to investors that they may 'earn' more than 10% On trust deed notes held in their portfolios in the enent the trustors liquidate their obligations in advance of maturity, thereby establishing 'windfall' profits to the investors, it has been the consistent practice of LATD, in such situations, to withdraw such trust deeds from investors accounts and secretly appropriate the profits to itself. The following is a classic example of such gross overreaching of investors.
 '2. On April 1, 1959, LATD purchased 43 notes secured by second deeds of trust on Tract 3068, known as Riviera I and Riviera II. The homes were constructed on leasehold estates. Each note had a face value of $3,500. LATD purchased the notes for $2,345 each and sold them to its investors for an average of approximately $3,213 each, realizing a profit it on the 43 notes of $37,353. Under date of September 29, 1959, LATD received notice that an escrow had been established with Newport Balboa Savings & Loan Association under which the 43 notes were to be satisfied in full, in advance of maturity, and a request that LATD forward the original notes, deeds of trust, signed requests for reconveyance and its demands for reconveyance. The notice also stated that, 'They will of course be used only when we hold for your account the full amount of your demand.'
 '3. In October, 1959, LATD sent form letters to the investors in the 43 trust deed notes advising them, in part, '* * * We find it desirable to repurchase this Deed of Trust at this time in accordance with our regular procedure whenever further action is required. The price to repurchase the Deed of Trust will be credited to your purchase authorization.'
 '4. By letters dated October 19 and 20, 1959, LATD transmitted to Newport Balboa Savings & Loan Association 28 of the 43 notes and deeds of trust, specifying that the Association could deliver them to the parties in interest when it held for LATD the sum of $3,426 each (face value), with interest at the rate of 7% Per annum until the date received.
 '5. LATD, during October, 1959, removed the 43 deeds of trust from the investors' accounts, crediting each account $3,190, although LATD anticipated receiving $3,426 for each such deed of trust on reconveyance or an additional and secret profit of $9,897. The investors were not advised that LATD was to receive the full balance due on the notes, nor were they given the opportunity of determining whether they themselves should reconvey and realize the additional profit.
 '6. The entire sequence of events in which LATD sought to appropriate the 'windfall' profits belonging to investors, in callous disregard of their legal and moral obligations to such investors, is elaborately set forth in a schedule (PX 77), the accuracy of which is admitted by the defendants. In this instance, the fact that LATD had retained title to 20 of the 43 trust deeds as 'Trustee' for the investors facilitated its unilateral removal of the trust deeds from the accounts of those investors. In such instances, LATD merely advised the investors that the trust deeds were being removed from their accounts.
 '7. In another and unrelated situation, on March 20, 1959, LATD purchased trust deed No. 7195M for $3,274, and on May 1, 1959 sold it to Benjamin C. Griswold for $4,112. About August 4, 1959, LATD received a letter from Bank of America advising that the trustor had opened an escrow in order to liquidate his obligation in advance of maturity, and requesting that LATD forward the necessary papers, together with its demand for their use.
 '8. On August 20, 1959, LATD forwarded the necessary instruments to Bank of America and advised that the unpaid principal balance of the note was $4,377 with interest paid to June 1, 1959. On September 8, 1959, Bank of America mailed to LATD a check in the amount of $4,459, representing the entire balance due on the note. On September 9, 1959, LATD advised the investor as follows: 'We find it necessary to withdraw this Deed of Trust at this time. This is according to our regular procedure whenever further action is required.' On September 18, 1959, the ledger account of the investor was credited with $4,027. The ledger card contains the notation 'Repurchased TD-7195.'
 '9. The investor was not notified by LATD that it had received settlement in full of the balance due on the note. The 'further action' required in this situation was simply the appropriation by LATD of the difference between the $4,459 received from the trustor and the $4,027 credited to the account of the investor, or the sum of $434 which rightfully belonged to the investor.
 '10. In still another such situation, in July, 1959, LATD received a letter from the trustor of deed of trust No. 7177, stating, '* * * we are planning to sell and the purchaser is desirous of paying off my note to you * * *' On July 31, 1959, LATD advised the trustor that 'the unpaid principal balance is $1,321.24 with interest paid to July 1, 1959.' On August 19, 1959, LATD addressed a letter to Security First National Bank stating, 'We have been advised that an order has been opened with you which is to include payment in full of the principal balance, together with interest, of the deed of trust covering the referenced property' (Trust Deed No. 7177). LATD enclosed the original note and trust deed, and advised the bank that the unpaid balance of the note was $1,321.24 with interest paid to July 1, 1959.
 '11. On August 19, 1959, LATD advised the investor to whom the trust deed note had been sold: 'We find it necessary to withdraw this Deed of Trust at this time. This is according to our regular procedure * * *' On August 20, 1959, LATD removed Trust Deed No. 7177 from the account of the investor, crediting the account $1,213. On September 2, 1959, LATD received from Security First National Bank of Los Angeles a check in the amount of $1,335. On September 9, 1959, the ledger account of the investor was credited with $1,335. On September 18, 1959, the entry was reversed. A handwritten notation on the ledger card states 'Payment posted to this account in error. See repurchase of same above.'
 '12. The investor, of course, was not advised that LATD had appropriated the 'windfall' profit under circumstances which could not have resulted from mistake or inadvertence.'
 
 
 [5]
 In Connelly, the judge referred to a party before him as a Communist, and advised his attorney that he (the judge) was sorry the attorney was representing the client; admitted that the judge, as a United States Attorney, had prosecuted the party's alleged coconspirators; and that he had stated the Communists hid behind the bill of rights, tried to destroy them, and believed the Communist party to be an illegal conspiracy
 
 
 [6]
 In Gladstein, the defendant judge had, sua sponte, issued an order to show cause why an attorney should not be disbarred, because of a contempt committed before a different court, in a Communist conspiracy trial
 
 
 [7]
 'Mr. Foley: Oh, your Honor, I certainly must deny--
 'The Court: I will strike out the word 'signals' because I have to listen and I am not that observing. But I share your statement 100 per cent, Mr. Kennamer, and I say it applies to Mr. Cuthbertson and it applies to Mr. Foley, and I remonstrated with them before, and I want the record to show it does not apply to Mr. Bentley Ryan. The court resents it, and I think it is misconduct, and if it is going to happen again in the future, the court is not going to be fair; I am going to take some punitive measure against Mr. Cuthbertson and Mr. Foley for constantly violating the orders of this court and rulings of this court. I want that in the record. And I want in the record that Mr. Ryan has not participated in these false objections that there is no legal basis for, and made for one purpose only, to alert the witness and frighten the witness.' (Appellants' Opening Brief, Appendix IV, p. 10.)
 
 
 [8]
 The article as it appeared in its entirety reads as follows:
 'Federal Court Clarifies Trust Deed & Mortgage Exchange Activities
 'On Feb. 18, 1959, the U.S. Court of Appeals for the 9th Circuit, San Francisco handed down a unanimous decision which clarified many of the issues involved in the long drawn out dispute between L.A.T.D. & M.E. and the SEC.
 'For over a year now we have been harassed by the SEC with their ill-considered and irresponsible charges against company. They first attempted to our company. They first attempted to intimidate us, then later resorted to smear tactics in their press releases. The ruling handed down by Chief Judge A. L. Stephens, Circuit Judge Wm. Healy, and Circuit Judge Stanley N. Barnes, held in pertinent part:
 "This is a most unusual case in that there is no evidence in the record of any loss to any purchaser of any trust deeds sold by defendant Los Angeles Trust Deed & Mortgage Exchange.'
 "Again we repeat that this record fails to disclose that any one person has been 'defrauded,' * * * out of any money. There are no 'investors' or 'customers' complaining or a party to this law suit.'
 "The record fails to support any findings of insolvency or bankruptcy of Los Angeles Trust Deed & Mortgage Exchange or Trust Deed & Mortgage Exchange.'
 'The Court of Appeals has referred back to the District Court the task of now determining whether or not the Secured 10% Earnings accounts should be considered an 'investment contract.' If it is determined that it is an investment contract, it may be necessary for the company to register as security dealers with the SEC.
 'All of the officers and employees of TD&ME are most pleased by this decision. We are indeed grateful to all of our friends and customers who have steadfastly remained confident in the integrity and financial stability of our company.
 'To those of you who delayed making a decision as to starting or increasing your Secured 10% Earnings Account, may we respectfully suggest that there's no better time than right now.' (Plaintiff's Ex. 180.)
 
 
 [9]
 West's May 31st, 1959 statement showed the following:
 'Condensed Summary'
 TRUST DEED & MORTGAGE EXCHANGE
 2267
 '*James &
 Marilyn J. West, Jr.Via Lacumbre
 San Rafael, California
 ---------------------------------------------------------
 Combined Estimated
 Earnings Liquidation
 Total Cash and/or Value of all
 Received Projected Assets in
 Date *** To Date Accruals Your Account
---------------------------------------------------------
Apr. 30 '59 2,500.00* 2,627.64
May 31 '59 21.90 2,649.54
 'WE APPRECIATE YOUR ACCOUNT: You may add to it at any time. Just mail in your check for any amount and we will apply it to your account. The right hand column is a computed summary of what we consider to be the cash value of your account as of this date. Your actual account consists of the cash, notes and earnings completely detailed on our ledger card, a copy of which will be forwarded upon request. You already have the basic details of each transaction in the confirmation sent you at the time of sale.'
 (Plaintiff's Ex. 17.)
 
 
 [10]
 Combining for ease of copying the first two pages of Plaintiff's Exhibit 18, we see:
 Account 2267 2001
 'James West, Jr. and
 Marilyn J. West
 
 
 [121]
 Via Lacumbre
 San Rafael, California
 Husband & wife, as joint tenants.
 Collect & service notes. Apply all princ. & int.
 ---------------------------------------------------
 Receipt
 Check, or * Customer's Cash Paid
 Collection Cash Rec'd to Customer
 Date Number This Month This Month
---------------------------------------------------
Nov 25 '58 7,578.00 2,500.00
Nov 30 '58
Dec 31 '58
1-31-59
2-28-59
3-31-59
4-30-59
5-31-59
6-12-59 7563 2500.00
 TABLE CONTINUED
--------------------------------------
 Estimated
 Combined Liquidation
 Earnings Value of
 and/or All Assets
 Total Cash Projected in Your
 to Date Accruals Account
--------------------------------------
2,500.00* 2,500.00
 20.83 2,520.83
 21.01 2,541.84
 21.18 2,563.02
 21.36 2,584.38
 21.54 2,605.92
 21.72 2,627.64
 21.90 2,649.54
 0* 149.64
 0 "
 ck 7653 to close account
 
 
 [11]
 The record abounds with representations made by appellants' employees which the corporate defendants' officers disclaim. Merely as an example, note the reference, even in 1959, to appellants' 'Investment brochure' explaining 'types of investment.' (Letter of March 12, 1959, to James T. Penning. Plaintiff's Ex. 59A.)