Mary F. EL KHADEM, Plaintiff-Appellee,

v.

EQUITY SECURITIES CORPORATION, a corporation, et al., Defendant-Appellant.

No. 72-1380.

United States Court of Appeals, Ninth Circuit.

March 20, 1974.

John L. Endicott (argued), of Gibson, Dunn & Crutcher, Los Angeles, Cal., John B. Gregory, of Burch & Platt, San Diego, Cal., for defendants-appellants.

Arnold O. Steele (argued), La Jolla, Cal., for plaintiff-appellee.

Before WRIGHT and TRASK, Circuit Judges, and BYRNE, Sr.* District Judge.

## OPINION

EUGENE A. WRIGHT, Circuit Judge:

This is an action to recover damages for alleged violations of the Securities Act of 1933, the Securities Exchange Act of 1934, and state law. Defendants moved to dismiss, claiming that the case does not involve the purchase or sale of a "security" and therefore neither the Securities Act nor the Securities Exchange Act confer jurisdiction on the district court.[1] The district court held that the case does involve the sale of a security and denied the motion to dismiss. Appellants appeal,[2] and we affirm.

## I

## BACKGROUND

Defendant Equity Securities Corporation is a registered and licensed dealer-broker of securities and is a wholly owned subsidiary of defendant Equity Funding Company of America. Defendant Lyman Spurlock is an investment advisor, employed by Equity Securities

and acting as its agent. During the period in question, Lyman Spurlock served as investment counsellor to plaintiff, Mary El Khadem.

In her amended complaint, Ms. El Khadem alleged the following series of events. In 1968, Mr. Spurlock advised her to invest in a plan offered by Nationwide Investment Corporation.[3] Under this plan Ms. El Khadem borrowed $40,000 from Nationwide to purchase mutual funds that in turn were pledged as collateral for the loan. Ms. El Khadem was also required to pledge cash collateral and to prepay interest. The plan afforded Ms. El Khadem a tax advantage derived from prepaying interest and gave her investment leverage in anticipation of a rising market.

Under the Nationwide agreement, Ms. El Khadem was required to pledge securities to Nationwide, including the mutual funds purchased with the borrowed $40,000, valued at 175% of her indebtedness. Nationwide was given the power to rehypothecate her collateral, up to the amount of her indebtedness, and pledge it to secure Nationwide's own borrowings for business purposes. Nationwide was also given the power to assign Ms. El Khadem's promissory note.[4] The

---

* Of the Central District of California. Judge Byrne participated in the oral argument and conference on the case, but did not participate in the opinion, having died on March 9, 1974.

1. Although the motion was framed by defendants and treated by the district court as a motion to dismiss for lack of subject matter jurisdiction, it is more properly characterized as a motion to dismiss for failure to state a claim under the Securities Act of 1933 or the Securities Exchange Act of 1934. The question whether the case involved a security was itself a federal question, and since the case involves more than $10,000, the district court had *jurisdiction* under 28 U.S.C. § 1331.

2. This is an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Appellants have complied with the requirements of that section.

3. There is no connection between defendants and Nationwide other than the fact that de-

fendants recommended the Nationwide investment plan to plaintiff.

4. Paragraph 10 of the loan and security agreement provided:

LENDER shall have full and complete right and power to assign this agreement or any part thereof, and to rehypothecate for LENDER'S financing purposes any or all collateral of BORROWER to secure LENDER'S borrowings in an amount not to exceed (a) BORROWER'S indebtedness to LENDER decreased by any unearned interest prepaid by BORROWER or increased by any accrued earned interest due LENDER; and (b) further increased by an amount not to exceed one-half of one percent (½%) of the original amount of this loan for each year and pro rata portion thereof of the unmatured portion of the initial ten year term of this loan; and (c) further increased by an amount not to exceed ten percent (10%) of the original amount of this loan. With respect to (c), above, LENDER shall only

agreement did not require Nationwide to include in an assignment of her promissory note a provision that collection was conditioned upon return of the collateral to Ms. El Khadem. Nor did the agreement limit Nationwide's power to rehypothecate Ms. El Khadem's collateral to situations where Nationwide's creditors could foreclose only if Ms. El Khadem did not honor her promissory note.

Following a drop in the stock market, Ms. El Khadem was required to deposit more collateral to meet the 175% requirement. On the advice of Nationwide and defendants, she borrowed an additional $34,230 under conditions similar to the original $40,000 loan. The collateral, which then totaled $83,180, was converted to U. S. Treasury Bills.

The Nationwide plan was not registered as a security and no prospectus was issued. In June 1970, the Securities and Exchange Commission charged Nationwide with selling unregistered securities in violation of the Securities Act of 1933 and with fraud in violation of section 10(b) of the Securities Exchange Act of 1934. Thereafter, Nationwide suffered financial problems and was placed in receivership. Nationwide's creditors foreclosed on collateral

pledged to them, including Ms. El Khadem's rehypothecated Treasury Bills. She now claims the value of her lost collateral as damages in this action.

Stripped of its formalities, the Nationwide plan was essentially as follows: Ms. El Khadem supplied Nationwide with cash and securities, in the form of prepaid interest and rehypothecatable collateral, and the use of her credit, in the form of an assignable promissory note, to capitalize Nationwide's business ventures. Nationwide used this capital for its own business purposes by rehypothecating it and pledging it to secure Nationwide's own borrowings. In return for supplying Nationwide with venture capital, Ms. El Khadem received a tax benefit and investment leverage.

The only question before this court is whether the Nationwide plan was a "security" as defined by the Securities Act of 1933 and the Securities Exchange Act of 1934. We hold that it was.

## II

### WAS THE NATIONWIDE PLAN A SECURITY?

The Securities Act of 1933 and the Securities Exchange Act of 1934 define

---

have the foregoing right and power to borrow the amount so determined provided either of the following conditions are satisfied: (1) LENDER assigns to BORROWER'S collateral account LENDER'S otherwise unpledged mutual fund collateral equal in liquidation value to no less than one hundred fifty percent (150%) of the amount so borrowed, and upon the further condition that LENDER shall immediately sell such collateral if the indebtedness against such collateral shall amount to eighty percent (80%) or more of the liquidation value thereof; and in the event of such sale, LENDER shall reduce its indebtedness on BORROWER'S collateral in an amount equal to LENDER'S actual borrowings as authorized in this Section 10(c); or, (ii) LENDER assigns to BORROWER'S collateral account equity in already pledged mutual fund collateral equal in liquidation value to no less than three hundred percent (300%) of the amount so borrowed, but the total indebtedness at the time LENDER so borrows, including the original amount of BORROWER'S loan, against such mutual fund collateral

shall not exceed seventy-five percent (75%) of the liquidation value thereof; and if the total indebtedness against such collateral shall amount to eighty percent (80%) or more of the liquidation value thereof, LENDER shall immediately sell such collateral, and in the event of such sale, LENDER shall reduce its indebtedness on BORROWER'S collateral in an amount equal to LENDER'S actual borrowings as authorized in this Section 10(c); (d) LENDER'S right and power to borrow and rehypothecate, as provided in Section 10(c), above, shall at all times be subject to BORROWER'S call on a one-day demand basis and shall not affect BORROWER'S collateral requirements as heretofore set forth in this agreement. LENDER'S pledge or pledges shall have no responsibility or requirement to determine whether its loan or their loans to LENDER meet the aforesaid loan limitations and shall be fully protected on any loan or loans made by it or them against the security of LENDER'S rehypothecated collateral.

a "security" as including an "investment contract."[5] The district court held that the Nationwide plan was an "investment contract" and therefore a "security" as defined by the Acts.[6]

As this court recently noted in S. E. C. v. Glenn W. Turner Enterprises, Inc., 474 F.2d 476, 480–481 (9th Cir. 1973), the Securities Act of 1933 and the Securities Exchange Act of 1934 are remedial legislation requiring broad and liberal construction. See S. E. C. v. W. J. Howey Co., 328 U.S. 293, 299, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946); Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). The Acts must be interpreted liberally to effect their purpose of ensuring full and fair disclosure to purchasers of securities and protecting the public from speculative or fraudulent schemes of promoters.[7] S. E. C. v. Glenn W. Turner Enterprises, Inc., *supra,* 474 F.2d at 480–481. Thus, in S. E. C. v. Joiner Corp., 320 U.S. 344, 351, 64 S.Ct. 120, 123, 88 L.Ed. 88 (1943), the Supreme Court noted that

> the reach of the Act does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved as matter of fact that they were widely offered or dealt in under terms or courses of dealing which establish their character in commerce as "investment contracts," or as "any interest or instrument commonly known as a 'security.'"

Similarly, the Court has noted that the definition of a security "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," S. E. C. v. W. J. Howey Co., *supra,* 328 U.S. at 299, 66 S.Ct. at 1103, and that while "searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for

---

5. Section 2(1) of the Securities Act of 1933 provides:

    (1) The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

    15 U.S.C. § 77b(1).

    Section 3(a)(10) of the Securities Exchange Act of 1934 provides:

    (10) The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

    15 U.S.C. § 78c(a)(10).

6. The district court also held that the mere fact that plaintiff signed a "note" did not bring the transaction within the scope of the Acts. This portion of the district court's judgment has not been appealed, and we intimate no opinion concerning it.

7. The aim is to prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation; to place adequate and true information before the investor; to protect honest enterprise, seeking capital by honest presentation, against the competition afforded by dishonest securities offered to the public through crooked promotion; . . . .
    S.Rep.No.47, 73d Cong. 1st Sess. 1 (1933).

substance and the emphasis should be on economic reality," Tcherepnin v. Knight, *supra*, 389 U.S. at 336, 88 S.Ct. at 553.[8]

In light of the foregoing, we must determine whether the economic realities of the Nationwide plan, rather than its formal structure as a loan and security agreement, are such that it is an "investment contract" as the district court held. Our principal guidance is derived from S. E. C. v. W. J. Howey Co., *supra*.

In *Howey*, the Court held that a real property transfer of citrus groves, together with an agreement whereby the grantor cultivated and marketed the crops, was an investment contract and therefore a security as defined by the Acts. The Court stated that "[t]he test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.* 328 U.S. at 301, 66 S.Ct. at 1104. The Court relied on the facts that "[t]he investors provide[d] the capital and share[d] in the earnings and profits; the promoters manage[d], control[led] and operate[d] the enterprise." *Id.* at 300, 66 S.Ct. at 1104.

Defendants contend that the Nationwide plan does not meet the test laid down in *Howey*. First, they argue that Ms. El Khadem did not provide Nationwide with capital but rather that she received investment capital in the form of a loan. Notwithstanding the fact that Ms. El Khadem received a loan for investment purposes, however, she did provide Nationwide with capital for its business operations in the form of rehypothecatable collateral and an assignable promissory note.[9] It was with this capital that Nationwide could finance its business ventures. Putting their argument slightly differently, appellants argue that under the Nationwide plan as

written, Ms. El Khadem bore no risk of losing her capital. This is merely another way of saying that Ms. El Khadem did not provide Nationwide with risk capital at all. Since her collateral could be rehypothecated only in an amount not exceeding her indebtedness to Nationwide, appellants contend that she could not suffer any out-of-pocket loss. The mere fact that Nationwide rehypothecated her collateral in violation of this limitation should not, appellants suggest, render a plan a security that was not a security when written.

Appellants correctly point out that the Nationwide plan must be analyzed as of the time Ms. El Khadem agreed to it. If subsequent acts by Nationwide in violation of the agreement could convert the plan into a security, legitimate expectations would be defeated. Appellants are mistaken, however, in their contention that Ms. El Khadem risked no loss, and therefore did not provide risk capital under the plan as written. Since her capital could be rehypothecated only to the extent of her indebtedness, she risked loss only if it were possible both to lose the rehypothecated collateral and to be required to pay on the promissory note. An examination of the agreement reveals this possibility.

Although the promissory note was not negotiable,[10] Nationwide seemingly retained the right to assign Ms. El Khadem's obligation free of a duty to redeem her collateral. The agreement granted Nationwide "full and complete right and power to assign this agreement or any part thereof, *and* to rehypothecate for [Nationwide's] financing purposes any or all collateral of borrower," [emphasis added] limited to Ms. El Khadem's indebtedness. The use of the conjunctive form implies that Nationwide intended to retain the right to assign the obliga-

---

8. For examples of the varied plans which have been held to be securities, see cases cited in S.E.C. v. Glenn W. Turner Enterprises, Inc., 474 F.2d 476, 481 n. 6 (9th Cir. 1973).

9. Because we hold that the collateral and promissory note were capital, we need not

decide whether the prepayment of interest was also a transfer of risk capital to Nationwide.

10. The promissory note was subject to the conditions of the security agreement, and was not, therefore, negotiable. *See* Cal. Comm.Code § 3105 (2) (a).

tion to one assignee and repledge the collateral to another. Since Ms. El Khadem technically consented to this separation of the obligation and the collateral, collection could be made on the promissory note notwithstanding a foreclosure on the collateral.[11] Therefore, by agreeing to the Nationwide plan Ms. El Khadem subjected herself to a risk of financial loss.

■ Second, appellants contend that Ms. El Khadem did not share in the profits of Nationwide. She was, however, provided a financial incentive by Nationwide to invest in their plan in the form of an opportunity to gain a tax advantage and to acquire investment leverage. It is true that unlike the situation in *Howey*, the financial gain for Ms. El Khadem did not vary from year to year depending on the skill with which Nationwide managed her collateral. Rather, only the risk of loss varied with Nationwide's management skills. But this distinction between the Nationwide plan and the *Howey* plan is without significance when determining whether the plan is a security. The distinction is precisely that between a common stock and a corporate bond, yet a corporate bond is not for that reason excluded from the definition of a security.[12] Therefore, the fact that Ms. El Khadem's "profit" was constant while her risk of loss depended on Nationwide's management skills does not remove the plan from the definition of a security.

Third, appellants argue that Ms. El Khadem did not invest in a "common enterprise" as required by *Howey*. Appellants rely on the fact that while Nationwide pooled Ms. El Khadem's collateral with that of other borrowers, the pooling was in violation of the agreement. Therefore, appellants argue, the Nationwide plan as written did not put Ms. El Khadem's collateral into a "common enterprise" with the collateral of others.

Assuming that the pooling was in violation of the agreement,[13] Ms. El Khadem nevertheless invested in a "common enterprise." This court has defined a "common enterprise" as "one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." S. E. C. v. Glenn W. Turner Enterprises, Inc., *supra* at 482 n. 7, citing Los Angeles Trust Deed & Mortgage Exchange v. S. E. C., 285 F.2d 162, 172 (9th Cir.), cert. denied 366 U.S. 919, 81 S.Ct. 1095, 6 L. Ed.2d 241 (1961). Ms. El Khadem's risk of loss was interwoven with Nationwide's financial success, as was the risk of the other Nationwide borrowers. Even if each borrower's collateral could not be pooled with that of others, the fortunes of the borrowers were commonly dependent upon the success of Nationwide's business operations.

■ In conclusion, the Nationwide plan was an investment of risk capital. Ms. El Khadem risked financial loss in order to gain certain financial advantages. Nationwide sought the use of Ms. El Khadem's capital, in the form of credit and collateral, for its own business purposes. Ms. El Khadem's risk depended on the skill with which Nationwide conducted its business ventures and managed her collateral and promissory note. It is precisely this type of risk venture that the Securities Act of 1933

---

11. We need not decide that state law would permit this interpretation in a form contract drafted by the lender. We merely hold that Nationwide attempted to construct an arrangement in which the borrower risked out-of-pocket loss.

  Appellant argues that our interpretation of Nationwide's right to assign and rehypothecate is contrary to Cal.Comm.Code § 9207(2)(e) which provides:

  The secured party may repledge the collateral upon terms *which do not impair the*

*debtor's right to redeem it.* (Emphasis added.)

This restriction is applicable, however, only "[u]nless otherwise agreed." Cal.Comm. Code § 9207(2).

12. *See* 15 U.S.C. § 77b(1), 78c(a)(10).

13. It is not clear that pooling was, in fact, in violation of the agreement, since no provision explicitly proscribed polling.

and the Securities Exchange Act of 1934 were designed to control. Therefore, we hold that the Nationwide plan was a security as defined by the Acts.[14]

The order of the district court is affirmed. The case is remanded for further proceedings.

---

14. Appellant suggests that by holding the Nationwide plan a security we hold virtually all secured loans to be securities. Our holding applies only to cases where the "borrower" risks an out-of-pocket loss in return for financial gain. Our holding does not apply to typical secured loans where the borrower cannot be required to honor the promissory obligation without a redemption of the collateral.

The elements of the Nationwide plan we rely upon to hold it a security are present in a wide variety of financial transactions. For example, a savings account or insurance policy, like a corporate bond, subject the investor to some risk of capital loss in return for a relatively fixed return. These transactions are explicitly exempted from the registration requirements of the 1933 Act, 15 U.S.C. § 77c, not because investors do not need protection, but because other agencies regulate the institutions involved.