AMERICAN MUTUAL REINSURANCE COMPANY, Plaintiff and
Counterdefendant-Appellee, v. CALVERT FIRE INSURANCE COMPANY,
Defendant and Counterplaintiff-Appellant.

First District (4th Division)   No. 62120

Opinion filed July 14, 1977.—Supplemental opinion filed on denial of rehearing
September 29, 1977.

Michael L. Weissman, of Aaron, Aaron, Schimberg & Hess, of Chicago, and Louis Loss, of Cambridge, Massachusetts, for appellant.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (Thomas J. Weithers, D. Kendall Griffith, and Peter A. Stratigos, of counsel), for appellee.

Mr. JUSTICE LINN delivered the opinion of the court:

Plaintiff, American Mutual Reinsurance Company (Amreco), brought suit for declaratory judgment against defendant, Calvert Fire Insurance Company (Calvert). In its suit, Amreco sought to have a contract of insurance entered into between the parties declared to be binding and in full force and effect. Calvert by way of answer and counterclaim alleged, *inter alia*, that the agreement constituted a sale of a security by Amreco and that, in connection with the sale, Amreco had violated Federal and State securities laws. On that basis, Calvert sought rescission of the contract and an award of damages. The trial court struck and dismissed the several affirmative defenses and counts of the counterclaim which alleged violations of the securities laws. Pursuant to Supreme Court Rule 308 (Ill. Rev. Stat. 1973, ch. 110A, par. 308) the trial court certified questions of law for interlocutory appeal.

Amreco's complaint alleged that it is an Illinois corporation in the business of reinsuring property and casualty risks and organizing and managing a reinsurance pool comprised of one hundred insurance companies.[1] Amreco undertakes to reinsure portions of property and casualty insurance policies issued by primary insurers to individual insureds, and in return receives a portion of the premiums paid for such policies. Calvert, an insurance company licensed to do business in Illinois, and the other insurance companies, participate in Amreco's insurance pool by accepting portions of the risks assumed by Amreco and receiving portions of the premiums earned. The agreement with Calvert, entitled "Multiple Line Participating Agreement," provides that Calvert's participation in this arrangement would commence January 1, 1974, and could be terminated by either party at the close of any December 31, by giving the other party 6 months prior written notice.

On April 22, 1974, Calvert requested "retro-active termination" of the agreement. Amreco has maintained that Calvert is bound for the minimum participation period of one year. By this suit Amreco seeks to compel Calvert to share the premiums and losses attributable to that period.

---

[1] Suit was also brought for the use of the other insurance companies participating in the pool.

In its answer, Calvert set forth seven affirmative defenses, five of which were claimed to entitle Calvert to rescission of the contract and an award of damages. The first defense alleged that the participatory interests in the pool which Amreco sold constituted an offer and sale to the public of a security within the meaning of the Securities Act of 1933 (15 U.S.C. §77a *et seq.* (1970)) and that Amreco did not comply with the registration requirements of the Act. The second defense alleged violations of the Securities and Exchange Act of 1934 (15 U.S.C. §78a *et seq.* (1970)) in that Amreco had made omissions and misrepresentations of material fact. The third and fourth defenses alleged violations of the securities laws of Illinois and Maryland. The fifth defense alleged common law fraud in that Amreco's agents made material misrepresentations of fact, upon which Calvert relied, resulting in injury to Calvert.

The sixth defense alleged that Amreco lacked authority to maintain a suit on behalf of the other participants, and the seventh defense alleged that Amreco participated in and managed the pool without obtaining the approval of the Illinois Department of Insurance.

Calvert's counterclaim was comprised of four counts. The first three counts alleged that Amreco's offer and sale to Calvert of the participatory interest constituted a security and violated the Federal Securities Act of 1933, and the Illinois and Maryland securities laws, respectively. Calvert sought to have the purchase declared void and sought damages of two million dollars. The fourth count, seeking similar damages, alleged common law fraud by Amreco.

In its motion to strike the first, second, third, fourth and sixth defenses set forth in the answer, and to dismiss the first three counts of the counterclaim, Amreco alleged, *inter alia,* that its contract with Calvert did not constitute a security under Federal, Illinois, and Maryland law. Further, Amreco alleged that the McCarran-Ferguson Act (15 U.S.C. §1011 *et seq.* (1970)) precluded application of Federal securities law, that the reinsurance contract was exempt from registration under section 3(a)(8) of the Securities Act of 1933, and that Calvert was a seller of reinsurance and not a purchaser of a security.

The trial court found that the agreement did not constitute a security and struck those portions of Calvert's answer and counterclaim containing such allegations. This interlocutory appeal followed. We affirm the result reached by the trial court.

■■ At the outset we note that in determining the sufficiency of the answer and counterclaim when attacked by a motion to strike or dismiss, all well pleaded facts are taken as true. (*City of Chicago v. Loitz* (1975), 61 Ill. 2d 92, 329 N.E.2d 208.) The disposition of the motions must be made upon a consideration of the allegations contained in Calvert's

pleadings. (*Mutual Tobacco Co. v. Halpin* (1953), 414 Ill. 226, 111 N.E.2d 155.) Although the parties have urged us to consider affidavits submitted by their corporate officers, they cannot properly be considered in determining the sufficiency of the pleadings. *Brooks v. Midas-International Corp.* (1977), 47 Ill. App. 3d 266, 361 N.E.2d 815.

The preamble to the reinsurance agreement entered into between Amreco and Calvert recited:

> "An agreement of reinsurance between the American Mutual Reinsurance Company, Chicago, Illinois, (hereinafter called the 'Company') and Calvert Fire Insurance Company, Philadelphia, Pennsylvania (hereinafter called the 'Participant').
>
> Whereas the Company issues to insurance companies (hereinafter called individually as an 'Insurer') contracts and binders of reinsurance covering Property and Casualty lines of insurance and combinations thereof, and
>
> Whereas the Company desires to reinsure with the Participant a share of liability under each of such contracts and binders of reinsurance.
>
> Now therefore the Company agrees to cede and the Participant agrees to accept a share of liability under each such contract."

After stating the proportion of Calvert's liability for each contract, the agreement provided that liability was limited to the lesser of $300,000 or 7.5 percent of Amreco's liability under the applicable insurance contract. The premium which Calvert was to receive for providing this reinsurance was 95.5% of Calvert's "proportionate share of the earned premiums paid by the Company (Amreco) on the contracts reinsured." Deducted from this premium were any premium adjustments paid on the contracts, and any premiums for reinsurance which might be obtained independently of the scheme of participation.

On appeal, Calvert readily acknowledges that it agreed to reinsure a portion of Amreco's contracts of reinsurance. However, it contends that the consideration received from Amreco was a security, since Calvert received a participatory share in the reinsurance pool. Before reaching this question, however, we must determine whether the reinsurance pool constitutes "the business of insurance" and is thus exempt under the McCarran-Ferguson Act from Federal securities laws.

■■ Section 2(b) of the McCarran Act (15 U.S.C. §1012(b) (1970)) provides that "No Act of Congress shall be construed to invalidate, impair or supercede any law enacted by any State for the purpose of regulating the business of insurance * * * unless such act specifically relates to the business of insurance * * *." *In Securities & Exchange Com. v. National Securities, Inc.* (1969), 393 U.S. 453, 459-60, 21 L. Ed. 2d 668, 676, 89 S. Ct.

564, 568-69, the United States Supreme Court recited the history of the act[2] and defined its limits:

> "Given this history, the language of the statute takes on a different coloration. The statute did not purport to make the States supreme in regulating all the activities of insurance *companies*; its language refers not to the person or companies who are subject to state regulation, but to laws 'regulating the *business* of insurance.' Insurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the 'business of insurance' does the statute apply. Certainly the fixing of rates is part of this business; that is what South-Eastern Underwriters was all about. The selling and advertising of policies, FTC v. National Casualty Co., 357 U.S. 560, 2 L. Ed. 2d 1540, 78 S. Ct. 1260 (1958), and the licensing of companies and their agents, cf. Robertson v. California, 328 U.S. 440, 90 L. Ed. 1366, 66 S. Ct. 1160, (1946), are also within the scope of the statute. Congress was concerned with the type of state regulation that centers around the contract of insurance, the transaction which Paul v. Virginia held was not 'commerce.' The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the 'business of insurance.' Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, directly or indirectly, are laws regulating the 'business of insurance.' "

We believe that the present reinsurance agreement meets the criteria set

---

[2] "The McCarran-Ferguson Act was passed in reaction to this Court's decision in *United States v. South-Eastern Underwriters Assn.*, 322 U.S. 533 (1944). Prior to that decision, it had been assumed, in the language of the leading case, that '[i]ssuing a policy of insurance is not a transaction of commerce.' *Paul v. Virginia*, 8 Wall. 168, 183 (1869). Consequently, regulation of insurance transactions was thought to rest exclusively with the States. In *South-Eastern Underwriters*, this Court held that insurance transactions were subject to federal regulation under the Commerce Clause, and that the antitrust laws, in particular, were applicable to them. Congress reacted quickly. Even before the opinion was announced, the House had passed a bill exempting the insurance industry from the antitrust laws. 90 Cong. Rec. 6565 (1944). Objection in the Senate killed the bill, 90 Congr. Rec. 8054 (1944), but Congress clearly remained concerned about the inroads the Court's decision might make on the tradition of state regulation of insurance. The McCarran-Ferguson Act was the product of this concern. Its purpose was stated quite clearly in its first section; Congress declared that 'the continued regulation and taxation by the several States of the business of insurance is in the public interest.' 59 Stat. 33 (1945), 15 U.S.C. §1011. As this Court said shortly afterward, '[o]bviously Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance.' *Prudential Insurance Co. v. Benjamin*, 328 U.S. 408, 429 (1946)." 393 U.S. 453, 458.

forth in *National Securities* since it is a closely related activity. Although it has been held that a reinsurance contract between two insurance companies does not involve the policyholder in that he lacks privity of contract with the reinsurer and has no right of action against it (*Citizens Casualty Co. v. American Glass Co.* (7th Cir. 1948), 166 F.2d 91), the ultimate purpose of the agreement is to provide reliable insurance to policyholders. Consequently, the agreement between Amreco and Calvert constitutes the "business of insurance" within the meaning of the McCarran-Ferguson Act.

The McCarran-Ferguson Act renders federal securities laws inapplicable when state legislation generally proscribes, permits, or otherwise regulates the conduct in question and authorizes enforcement through a scheme of administrative supervision. *Federal Trade Com. v. National Casualty Co.* (1958), 357 U.S. 560, 78 S. Ct. 1260, 2 L. Ed. 2d 1540; *Crawford v. American Title Insurance Co.* (5th Cir. 1975), 518 F.2d 217; *Commander Leasing Co. v. Transamerica Title Insurance Co.* (10th Cir. 1973), 477 F.2d 77.

Not only does the Illinois Insurance Code (Ill. Rev. Stat. 1973, ch. 73, pars. 204.1 *et seq.*) provide a scheme of general state regulation of the business of insurance, but the Insurance Code also contains specific provisions pertaining to the regulation of reinsurance agreements between insurance companies under Article XI. (Ill. Rev. Stat. 1973, ch. 73, pars. 785 *et seq.*) These provisions govern the extent to which reinsurance may be accepted or ceded by a company, and sets forth the conditions under which credit may be taken for the reserves on such ceded risks.

Among other statutes and regulations, Illinois Department of Insurance Rule 9.23 requires a comprehensive report of all reinsurance activity, including information regarding premiums, and sets forth more elaborate requirements for obtaining reinsurance credit. Rule 11.01 further requires companies, upon request, to furnish copies of reinsurance agreements.

■■ The instant case presents a transaction whereby Calvert agreed to insure a portion of each reinsurance contract entered into by Amreco with primary insurers. It is apparent that the parties entered into a reinsurance agreement, albeit one step further removed from the actual policyholder than conventional reinsurance. The agreement was therefore subject to the specific regulatory powers of Illinois concerning reinsurance. As such, characterizing as a security the premiums that would have been paid by Amreco provides no basis for a valid distinction. Amreco's payments, regardless of the form they may take, are subject to state regulation since ceded reinsurance premiums are under the control of the Director of the Department of Insurance. Thus, the McCarran-Ferguson Act precludes application of federal securities laws.

■■ Furthermore, even without the McCarran-Ferguson Act, the

Securities Act of 1933 and the Securities Exchange Act of 1934 would still be inapplicable since insurance contracts are not considered securities within the meaning of these acts. *Securities & Exchange Com. v. Variable Annuity Life Insurance Co.* (1959), 359 U.S. 65, 3 L. Ed. 2d 640, 79 S. Ct. 618; *Securities & Exchange Com. v. United Benefit Life Insurance Co.* (1967), 387 U.S. 202, 18 L. Ed. 2d 673, 87 S. Ct. 1557; *Tcherepnin v. Knight* (1967), 389 U.S. 332, 19 L. Ed. 2d 564, 88 S. Ct. 548.

Section 3(a)(8) of the Securities Act of 1933 provides:

"(a) Except as hereinafter expressly provided, the provisions of this title shall not apply to any of the following classes of securites:

\* \* \*

(8) Any insurance or endowment policy or annuity contract or optional contract, issued by a corporation subject to the supervision of the insurance commissioner \* \* \* of any State or Territory of the United States or the District of Columbia \* \* \*."

15 U.S.C. §77c(a)(8).

This provision has been considered to be "supererogation." (1 Loss, Securities Regulation 497 (2d ed. 1961).) Congress specifically stated that the subsection "makes clear what is already implied in the act, namely, that insurance policies are not to be regarded as securities subject to the provisions of the act." (H. R. Rep. No. 85, 73d Cong., 1st Sess., 15 (1933).) The definition of a security under both the 1933 and 1934 acts are virtually identical, and have been similarly construed. See *Tcherepnin v. Knight*[3] (1967), 389 U.S. 332, 19 L. Ed. 2d 564, 88 S. Ct. 548.

Calvert contends that the participants in the reinsurance pool supplied Amreco with investment capital in the form of contractual commitments to indemnify Amreco. It is argued that the effect of these reinsurance commitments was to provide financing for Amreco's operations and to allow Amreco to enter into various reinsurance contracts which were to produce a profit for the pool.[4]

■■ We perceive no difference between the traditional payment for insurance and the arrangement in the instant case, and therefore must reject Calvert's characterization of the reinsurance pool. Amreco agreed to pay a set premium for obtaining Calvert's commitment. That premium would not vary in any manner in that, unlike profits derived from an investment, Calvert's income from premiums was fixed by the contract.

[3] On occasion, a specific exemption under the 1933 Act has been held to be inapplicable to the 1934 Act absent express language. (*Securities & Exchange Com. v. Ralston Purina Co.* (1953), 346 U.S. 119, 97 L. Ed. 1494, 73 S. Ct. 981.) Pertaining to insurance contracts, however, we believe that Congress did not intend that either act apply.

[4] Calvert vigorously urges us to hold that the arrangement involved is an investment contract which would be subject to the securities laws. "The test [for an investment contract] is whether scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Securities & Exchange Com. v. W. J. Howey Co.* (1946), 328 U.S. 293, 301, 90 L. Ed. 1244, 1251, 66 S. Ct. 1100, 1104.

(*Cf. Securities & Exchange Com. v. Variable Annuity Life Insurance Co. of America* (1959), 359 U.S. 65, 3 L. Ed. 2d 640, 79 S. Ct. 618; *Securities & Exchange Com. v. United Benefit Life Insurance Co.* (1967), 387 U.S. 202, 18 L. Ed. 2d 673, 87 S. Ct. 1557.) Actual income to Calvert being dependent upon payments made to the primary policyholders for losses covered under their policies does not alter this fact. Precisely the same situation occurs in every contract of insurance. Viewing the transaction in this manner, it becomes apparent that Amreco's undertaking to pay premiums did not constitute a security. Although it has long been recognized that an insurance contract may contain elements of a security which may be separated from traditional insurance activities (*Securities & Exchange Com. v. United Benefit Life Insurance Co.* (1967), 387 U.S. 202, 18 L. Ed. 2d 673, 87 S. Ct. 1557) no such situation is involved here.

Insofar as the Illinois Securities Law of 1953 (Ill. Rev. Stat. 1975, ch. 121½, par. 137.2—1 *et seq.*) and the Maryland Securities Act (32A Md. Ann. Code §25(1)) are concerned, both employ definitions similar in approach to that of the Federal acts. (See *Polikoff v. Levy* (1965), 55 Ill. App. 2d 229, 204 N.E.2d 807, *cert. denied*, 382 U.S. 903.) The reasoning involved in exempting insurance policies from Federal securities laws is equally applicable to holding that an exemption exists under state laws: "[A] savings account or insurance policy, like a corporate bond, subject the investor to some risk of capital loss in return for a relatively fixed return. These transactions are explicitly exempted from the registration requirements of the 1933 Act (15 U.S.C. §77c (1970)), not because investors do not need protection, but because other agencies regulate the institutions involved." (*El Khadem v. Equity Securities Corp.* (9th Cir. 1974), 494 F.2d 1224, 1230, *cert. denied*, 419 U.S. 900.) We believe the Illinois Department of Insurance has adequate means for regulating the insurance industry and therefore hold the Illinois Securities Act inapplicable. We assume that Maryland's policy pertaining to insurance contracts is similar. See *Colligan v. Cousar* (1963), 38 Ill. App. 2d 392, 187 N.E.2d 292.

For the foregoing reasons, the judgment of the trial court striking and dismissing portions of defendant's answer and counterclaim is affirmed.

Affirmed.

DIERINGER, P. J., and JOHNSON, J., concur.

SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

Mr. JUSTICE LINN delivered the opinion of the court:

In its petition for rehearing, Calvert urges us to reconsider our position

in confining our examination to the pleadings in this case. It is contended that if the entire record were reviewed, a different conclusion would be reached. However, our holding would not be affected by such a review.

Were the whole record to be considered, Calvert would be allowed to raise two additional issues. Throughout these proceedings, Calvert has urged that the affidavit submitted by its president establishes that the arrangement between the parties was not regulated. The affidavit contains the statement: "The relationship between Amreco and the insurers participating in the Pool is not subject to any regulation by the State Insurance Department of Illinois." We do not believe that a legal conclusion by an affiant interested in the present litigation can be conclusive on this issue. Furthermore, we note that the affidavit was made a part of the record in this case on August 5, 1975, several weeks subsequent to the dismissal by the trial court on June 16, 1975. Therefore, its submission was not offered in a timely manner and could not have been considered even if the entire record were reviewed.

The second issue which Calvert contends should be considered is that the agreement must be judged as that which Amreco represented it to be. It is asserted that Amreco used the terms "profits" and "investment," in its dealings with Calvert, and therefore the participatory interest should be held to be a security. We do not see the relevance of Amreco's use of the word "profits," since many undertakings, other than investments, are entered into with an expectation that the venture will prove profitable. Also, an examination of the record reveals that only after Calvert had entered into the pool did Amreco colloquially describe the arrangement as an investment. Although it is not inappropriate that an offering be judged as being what it is represented to be (*Securities & Exchange Com. v. C. M. Joiner Leasing Corp.* (1943), 320 U.S. 344, 88 L. Ed. 88, 64 S. Ct. 120), such a standard is inapplicable in a case such as the present one. Calvert was not induced to enter into the pool due to any representation by Amreco that participation constituted an investment.

Since these points raised by Calvert do not affect the outcome of this case, the judgment of the trial court stands as stated in our opinion and the Petition for Rehearing is denied.

DIERINGER, P. J., and JOHNSON, J., concur.