PAYABLE ACCOUNTING CORPORA-
TION, a Utah Corporation, Plaintiff
and Respondent,

v.

Douglas McKINLEY, Director, Utah
Securities Commission, Defendant
and Appellant.

No. 17589.

Supreme Court of Utah.

June 27, 1983.

David L. Wilkinson, Charles A. Carlson, Salt Lake City, for defendant and appellant.

Gerald L. Turner, Salt Lake City, Eric W. Bjorklund, Murray, Wallace R. Bennett, Salt Lake City, for plaintiff and respondent.

STEWART, Justice:

This appeal is from a summary judgment in which the district court held that two contracts offered by Payable Accounting Corporation to clients and to investors are not securities as defined by the Utah Uniform Securities Act, U.C.A., 1953, § 61–1–13(12). We reverse.

The facts are not in dispute. Payable Accounting Corporation (PAC) serves commercial enterprises by managing their accounts payable and payrolls. To subscribe to this service, the enterprises are required to sign an agreement called a "client contract." Among other things, the contract provides that:

(1) Each month the client business must deposit funds equal to its payables and payroll for the month in a bank account controlled by the Universal Clearing House (UCH), a trust established by PAC.

(2) During the month, the client must inform PAC of its payables at least five business days before they fall due.

(3) PAC will pay the client's accounts payable as they fall due. If the client's funds fall short during the month, PAC agrees to make up the difference from its own funds.

(4) The contract lasts one year and is renewable. At the end of the year, PAC pays the client 6% interest on the monies transferred to UCH during the year.

(5) PAC may hypothecate the monies transferred to UCH by the clients.

PAC needs cash reserves to pay its clients' accounts payable when the clients' own funds fall short. PAC solicits these reserves from private investors, whom they call "undertakers." These investors sign an "investor contract." Among other things it provides that:

(1) The investor will commit to PAC a specified amount of cash, credit, or

commodities which may be hypothecated.

(2) PAC may use the funds committed to pay the debts of PAC's clients.

(3) At the end of nine months, PAC agrees to return the principal amount committed. During the nine months, PAC pays a fixed monthly interest on the principal. The interest rate is negotiated between PAC and the investor and is specified in the agreement.

The investor also signs a "Commitment to Assume Debt," which sets forth the details of how his funds are to be committed to PAC.

The district court found that "PAC generates its own possible profits by an aggressive policy of taking trade discounts and through a realization of returns on available funds and credits before those funds are actually paid on client's behalf (i.e., the "float" period)." Because this is the only profit-generating method mentioned in the findings, we presume that it is also the method by which profits for the investors and clients are generated.

The contracts characterize PAC's operation as a "clearing house," and disavow the notion that lending or investing is actually taking place. The client contract states that "[i]t is understood that PAC and UCH are not lending institutions .... [They] are independent contractors, providing management and operations advice and ... clearing house services ..." The investor contract states that "[i]t is understood and agreed that [the undertaker] is not lending or investing the funds herein committed but that [the undertaker] is assuming the debt of PAC's clients."

In July, 1980 the Utah Securities Commission issued a stop order against PAC pursuant to U.C.A., 1953, § 61–1–12 and § 61–1–14(3) of the Utah Uniform Securities Act forbidding PAC from entering into any more client and investor contracts. In response, PAC brought this action against the Commission, seeking a declaratory judgment to rescind the stop order. On a motion for summary judgment, the district court held for PAC, ruling that the contracts are not securities. The Commission appeals.

As relevant here, U.C.A., 1953, § 61–1–13(12) of the Utah Uniform Securities Act defines securities as follows:

The word "security" means any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral-trust certificate; preorganization certificate or subscription; transferable share; *investment contract;* ... [Emphasis added.]

The meaning of the term "security" as used in § 61–1–13(12) has not been previously addressed by this Court. However, we are not without substantial guidance in the area. Section 61–1–13(12) is taken from the Securities Act of 1933, 15 U.S.C. § 77(b)(1) (1976), and the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10) (1976).[1] Because most state blue sky laws and the federal securities acts are similar, states frequently rely on federal case law in interpreting state security acts. *See, e.g., Suave v. K.C., Inc.,* 91 Wash.2d 698, 591 P.2d 1207 (1979); *American Mutual Reinsurance Co. v. Calvert Fire Insurance Co.,* 52 Ill.App.3d 922, 9 Ill.Dec. 670, 367 N.E.2d 104 (1977).

■ At the outset we note that securities laws are remedial in nature and should be broadly and liberally construed to give ef-

---

1. The two sections, § 77b and § 78c(a)(10), are virtually identical. Section 78c(a)(10) reads:
    (a) When used in this chapter, *unless the context otherwise requires—*

    .    .    .    .    .

    (10) The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract* .... [Emphasis added.]
    Although § 61–1–13(12) does not include the language "unless the context otherwise requires," we do not find that omission significant in this case.

fect to the legislative purpose. *See Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967); *S.E.C. v. W.J. Howey Co.,* 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946). The federal securities acts were adopted and designed to restore investors' confidence in the financial markets,[2] as was the Utah Act.[3]

■ The United States Supreme Court has construed the term "investment contract" broadly to include more than just stocks and bonds. In *S.E.C. v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 351, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943), the Court stated:

> [T]he reach of the [Securities] Act does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved as matter of fact that they were widely offered or dealt in under terms or courses of dealing which establish their character in commerce as "investment contracts," or as "any interest or instrument commonly known as a 'security.'"

In *S.E.C. v. W.J. Howey Co.,* 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946), the Court stated that the concept of an investment contract "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." And in *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967), the Court stated that "in searching for the meaning and scope of the word 'security' in the [Securities] Act, form should be disregarded for substance and the emphasis should be on economic

reality." The Utah act was intended to have similar flexibility and to place substance over form. Accordingly, we are not bound by the labels used by PAC to characterize its contracts. We look instead to the substance of those contracts.

The Supreme Court first defined the term "investment contract" in *S.E.C. v. W.J. Howey Co., supra,* in the context of contracts for the sale and cultivation of citrus trees. The contracts were sold by two sister Florida citrus companies, who used the money from the contract sales to finance their citrus growing operation. The contract buyers were patrons of a nearby resort hotel who, during their stay, were given tours of the citrus tree groves and an opportunity to "purchase" some of the trees. Although the contract buyers were formally the title owners of the trees, they took no part in the management of the trees. Almost all signed a service agreement which gave to the citrus companies the cultivation and harvesting rights. In return the tree owners were paid a yearly percentage of the harvest profits based on the number of trees they had purchased.

The Court held that the citrus contracts were securities. The Court's definition of an "investment contract" in *Howey* is applicable here:

> [A]n investment contract ... means [1] a contract, transaction or scheme [2] whereby a person invests his money in a common enterprise and [3] is led to expect profits solely from the efforts of the promoter or a third party ....

328 U.S. at 298–99, 66 S.Ct. at 1103. This test was based in part on language from a state case, *State v. Gopher Tire & Rubber Co.,* 146 Minn. 52, 56, 177 N.W. 937, 938

---

2. The Senate report of the 1933 Act stated:

> The aim is to prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation; to place adequate and true information before the investor; to protect honest enterprise, seeking capital by honest presentation, against the competition afforded by dishonest securities offered to the public through crooked promotion; ....

S.Rep. No. 47, 73d Cong., 1st Sess. 1 (1933), *reprinted in* 2 *Legislative History of the Securi-*

ties Act of 1933 and Securities Exchange Act of 1934, Item 17, p. 1 (J. Ellenberger & E. Mahar eds. 1973). *See also* FitzGibbon, *What Is a Security?—A Redefinition Based on Eligibility to Participate in the Financial Markets,* 64 Minn.L.Rev. 893, 912–918 (1980).

3. *See generally* Bennett, *Securities Regulation in Utah: A Recap of History and the New Uniform Act,* 8 Utah L.Rev. 216 (1963).

(1920), which described an investment contract as "[t]he placing of capital or laying out of money in a way intended to secure income or profit from its employment."

Both federal and state securities cases after *Howey* have widely relied on its definition of an investment contract. Although the test can hardly be mechanically applied if we are to remain true to the fundamental policies underlying our act, the definition has proven useful in deciding, in a wide variety of situations, what constitutes an investment contract.[4] Schemes that have been held to qualify as investment contracts include sale or assignment of mineral leases; contracts for the sale, lease or management of income-producing property such as fur-bearing animals and oyster beds; contracts for the resale of goods, merchandise, or other property; contracts evidencing shares or interest in certain partnerships or associations; contracts evidencing shares or interests in investment pools; and variable annuity or insurance contracts. *See* 69 Am. Jur.2d *Securities Regulation—Federal,* §§ 26–34 (1973); 69 Am.Jur.2d *Securities Regulation—State,* §§ 27, 28 (1973); 47 A.L.R.3d 1375 (1973).

In most of these schemes, the profits received by investors are, as in *Howey,* proportionately related to the profits of the business as a whole, or are otherwise directly dependent on the success of the business. In the language of *Howey,* "[t]he investors provide the capital and share in the earnings and profits." *Howey, supra,* 328 U.S. at 300, 66 S.Ct. at 1104. However, even in investment schemes in which investors receive a fixed rate of return, courts have held that an investment contract exists. *See El Khadem v. Equity Securities Corp.,* 494 F.2d 1224 (9th Cir.1974); *Los Angeles Trust Deed & Mortgage Exchange v. S.E.C.,* 285 F.2d 162 (9th Cir.1960); *State of*

*Ohio v. Crofters,* 525 F.Supp. 1133 (S.D.Ohio 1981); *LTV Federal Credit Union v. UMIC Government Securities, Inc.,* 523 F.Supp. 819, 829 n. 5 (N.D.Texas 1981); *S.E.C. v. Lake Havasu Estates,* 340 F.Supp. 1318 (D.Minn.1972); *Suave v. K.C., Inc.,* 91 Wash.2d 698, 591 P.2d 1207 (1979).

The crucial factor is not whether the rate of return is fixed, but whether the "investment transaction is so structured that the money to pay off the investor eventually will be generated by the venture or enterprise." *LTV Federal Credit, supra,* 523 F.Supp. at 829 n. 5. In *El Khadem, supra,* 494 F.2d at 1229, the court stated:

It is true that unlike the situation in *Howey,* the financial gain for Ms. El Khadem did not vary from year to year depending on the skill with which Nationwide managed her collateral. Rather, only the risk of loss varied with Nationwide's management skills. But this distinction ... is without significance .... The distinction is precisely that between a common stock and a corporate bond, yet a corporate bond is not for that reason excluded from the definition of a security.

Although the investment contract concept constitutes a "flexible" approach to the problem of securities regulation and may be applied broadly, it is, nonetheless, not without limitations. Thus, the definition of an investment contract may not extend beyond the definition of a security itself. The definition section of the Utah Uniform Securities Act excludes insurance, endowment policies, and annuity contracts from the definition of a "security." § 61–1–13(12). Also, for purposes of registration, sales, and prospectus requirements, the Act exempts a variety of instruments, including securities issued by banks, savings and loans, and credit unions. § 61–1–14.

---

4. The Fifth Circuit Court of Appeals has noted:

Although the Supreme Court has observed that the *Howey* test "in shorthand form, embodies the essential attributes that run through all of the Court's decisions defining a security," [*United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975)] it has ,never

suggested that the test is to be invoked ritualistically whenever the existence of a security is at issue.
*Meason v. Bank of Miami,* 652 F.2d 542, 549 (5th Cir.1981). *See also S.E.C. v. Koscot Interplanetary, Inc.,* 497 F.2d 473, 481 (5th Cir.1974) (*Howey* test is not possessed of any "talismanic" quality).

■ Furthermore, the definition of a "security" should not be so expansive as to include instruments or transactions which are adequately regulated by other agencies. In *Marine Bank v. Weaver*, 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982), the Court held that a federally-insured bank certificate of deposit is not a security. Although the Court did not expressly mention an investment contract, it stated:

> [W]e are satisfied that Congress, in enacting the securities laws, *did not intend to provide a broad federal remedy for all fraud.*
>
> . . . .
>
> . . . [T]here is an important difference between a bank certificate of deposit and other long-term debt obligations. This certificate of deposit was issued by a federally regulated bank which is subject to a comprehensive set of regulations governing the banking industry. Deposits in federally regulated banks are protected by the reserve, reporting, and inspection requirements of the federal banking laws; advertising relating to the interest paid on deposits is also regulated. In addition, deposits are insured by the Federal Deposit Insurance Corporation. Since its formation in 1933, nearly all depositors in failing banks insured by the FDIC have received payment in full, even payment for the portions of their deposits above the amount insured.
>
> . . . .
>
> It is [therefore] unnecessary to subject issuers of bank certificates of deposit to liability under the antifraud provisions of the federal securities laws since the holders of bank certificates of deposit are abundantly protected under the federal banking law. [Emphasis added, footnotes omitted.]

455 U.S. at 556–559, 102 S.Ct. at 1223–1225. *See also United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975) ("The primary purpose of the Acts of 1933 and 1934 was to eliminate serious abuses in a largely *unregulated* securities market"); *Wolf v. Banco Nacional De Mexico*, 549 F.Supp. 841, 852 (D.C.Cal.1982) (if a transaction is virtually risk-free because of governmental regulation, it is not a security); *American Mutual Reinsurance Co. v. Calvert Fire Insurance Co.*, 52 Ill.App.3d 922, 9 Ill.Dec. 670, 367 N.E.2d 104 (1977) (reinsurance contracts are not securities because they are regulated by insurance laws).

■ Another limitation on the principles governing investment contracts is that they do not include commercial loans and similar transactions, such as loan participation agreements. Of course "[i]n one sense every lender of money is an investor since he places his money at risk in anticipation of a profit in the form of interest." *C.N.S. Enterprises, Inc. v. G. & G. Enterprises, Inc.*, 508 F.2d 1354, 1359 (7th Cir.1975). However, even though the repayment of the interest and principal may depend on the success of the borrowing business, a number of factors distinguish commercial loans from securities. Such loans are usually private transactions between a few individuals, while securities are open, public offerings to a general class of potential investors.[5] The lender is usually a bank or large corporation with considerable lending expertise, whose need for protection against fraud is presumably less than the average small investor.[6]

■ Based on one or more of these factors, courts have generally ruled that commercial loans and loan participation agreements are not securities. *See, e.g., Meason v. Bank of Miami*, 652 F.2d 542 (5th Cir.

---

5. In *Howey*, 42 persons purchased interests in the citrus trees during a four-month period. 328 U.S. at 295, 66 S.Ct. at 1101.

6. Some securities, such as bonds, are secured by a company's assets. The securing of investments by collateral, of course, does not remove the investment from the ambit of the securities laws. Where a transaction is not clearly a security, however, collateral is a probative factor because "an unsecured lender is generally more dependent upon the managerial skills of the borrower than is a secured party who can look to the collateral in default of payment." *State of Ohio v. Crofters*, 525 F.Supp. 1133, 1137 (S.D.Ohio 1981).

1981); *Union Planters National Bank v. Commercial Credit Business Loans, Inc.,* 651 F.2d 1174 (6th Cir.1981) (applying "risk capital" test); *American Fletcher Mortgage Co. v. U.S. Steel Credit Corp.,* 635 F.2d 1247 (7th Cir.1980); *United American Bank of Nashville v. Gunter,* 620 F.2d 1108 (5th Cir. 1980). *See generally State of Ohio v. Crofters,* 525 F.Supp. 1133 (S.D.Ohio 1981) (setting forth six factors to determine if a transaction is an investment contract). It follows that consumer loans are also not securities.

■ In the present case, the investor contracts clearly meet the *Howey* test. Pursuant to those contracts the investors contribute money to PAC, and the funds generated are used by PAC to run its business. The investors are led to expect profits solely from the efforts of PAC. That the investors receive a fixed rate of return does not make this scheme any less an investment contract. The money to pay off the investors is still generated by PAC, and the risk of loss still depends on PAC's managerial skills.

Furthermore, the investor contracts are not subject to any of the limitations on the investment contract concept as discussed above. They are not excluded or exempted by statute from the definition of a security. They are not transactions which, as in *Marine Bank, supra,* are subject to banking or other regulation. Although PAC performs what it calls "clearinghouse" functions, it is not a bank. Finally, the contracts are not characteristic of commercial loans or similar agreements. They are not private, collateralized transactions between a few individuals, but rather are non-collateralized, unsecured transactions, offered publicly to a general class of potential investors. They are completely unlike the loan participation agreements that courts have generally held not to be securities.

■ For the same reasons that the investor contracts are securities, we hold that the client contracts are also securities. Ordinarily, the client would pay for having his accounts payable managed and paid. Under the client contract, however, the client not only receives the service of having his accounts payable paid but also receives a 6% return at the end of the year. The major motivation for clients to subscribe to this service is the 6% return, which is accomplished by PAC's management of the client's funds. Without PAC, the client could put his funds in a bank and draw approximately 6% interest, although he might have to deplete those funds on occasion to pay his accounts payable. In some instances, if he has cash flow problems, he may even need to borrow money to pay his accounts. Under PAC's management, the client gets interest on his funds as if he had left the entire amount in the bank year round, and saves any finance charges he might have incurred from short-term borrowing.

It is true, of course, that the client's profit is not "*solely* through the efforts of others," as *Howey* requires. The client participates in the process by informing PAC of its accounts payable five days before they fall due, and by depositing sufficient funds in the UCH account. However, the "solely through the efforts of others" portion of the *Howey* test has been modified by the courts to include situations where the investor participates in the investment scheme in some way, whether significant or minor. The test is whether the efforts made by the promoter are undeniably significant ones, i.e., essential managerial efforts which affect the failure or success of the business. *E.g., S.E.C. v. Glenn W. Turner Enterprises,* 474 F.2d 476 (9th Cir. 1973). Here the information supplied by the client, although necessary, is a minor part of PAC's profit generating technique; PAC's profit-generating efforts are the essential ingredient which determines the failure or success of the enterprise.

In sum, we hold that both contracts are investment contracts and therefore securities within the scope of § 61–1–13(12).

Reversed.

HALL, C.J., and HOWE and DURHAM, JJ., concur.

OAKS, Justice (dissenting in part):

I concur in the opinion and judgment of the Court, except the last three paragraphs.

I dissent from the holding that the client contracts are investment contracts. In substance, the client contracts concerned a money management service PAC performed for the businesses who contracted with them. The interest PAC paid on the funds used in the performance of its services was incidental to the main purpose of the contracts, just like the interest paid on client balances in stock brokers' accounts. Contracts covering what are predominantly service relationships should not be "investment" contracts for purposes of the Securities Act.