CALVERT FIRE INSURANCE
COMPANY, a Pennsylvania
Corporation, Plaintiff,

v.

AMERICAN MUTUAL REINSURANCE
COMPANY, an Illinois Corporation,
Defendant.

No. 75 C 103.

United States District Court,
N. D. Illinois, E. D.

Oct. 30, 1978.

Michael L. Weissman, Boorstein & Weissman, Chicago, Ill., for plaintiff.

Thomas J. Weithers, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

### BACKGROUND FACTS

WILL, District Judge.

On May 6, 1975, an order was entered in this matter staying all aspects of plaintiff Calvert Fire Insurance Company's (Calvert's) federal action that were simultaneously pending before the state court in *American Mutual Reinsurance Co. v. Calvert Fire Insurance Co.,* No. 74 L 10737 (Cir.Ct. Cook County, Ill., filed July 3, 1974). As explained at the time in an accompanying memorandum opinion, that order was entered in the interest of efficiency and economy in litigation, and to avoid an unseemly and undignified race to judgment between two courts.

The underlying facts set forth in that memorandum opinion are incorporated herein by reference. Briefly, the case arises out of an agreement reached in early 1974 whereby Calvert became a member of American Mutual Reinsurance Company's (Amreco's) 1974 reinsurance pool along with 99 other insurance companies. In April 1974, two events of significance occurred. First, Amreco released certain financial data concerning the operation of its reinsurance pool in prior years. Second, a wave of tornadoes struck the Midwest assuring that the 1974 reinsurance pool members would suffer heavy losses. Shortly after these two events, Calvert notified Amreco that it was rescinding its membership in the pool *ab initio.*

Soon thereafter, in July 1974, Amreco sued Calvert in state court on behalf of the pool alleging and seeking a judgment that Calvert was responsible for its share of any losses. In January 1975, following a number of technical motions, Calvert filed its answer, defending on the grounds that it had been induced to join the pool by material misrepresentations which had come to light only with the release of the financial data in April 1974. Calvert also filed a counterclaim for $2 million damages, even though it had yet to pay anything to the pool. A number of state and federal statutes, including the Securities Act of 1933 (1933 Act) and the Securities Exchange Act of 1934 (1934 Act), were invoked by Calvert in support of its position.

On the same day that it filed its answer and counterclaim in the state court, Calvert brought this action against Amreco in federal court for a declaration that it had been misled into joining the pool and therefore owed nothing to Amreco, and for the same $2 million in damages.[1] The identical state and federal statutes were invoked by Calvert.

The substantive issue before both courts was identical: whether Calvert validly rescinded its membership in the pool. If Calvert was materially misled into joining the pool, Amreco will not recover. If Calvert was not so misled, Amreco will recover. The issue and result is the same in both

---

1. This apparently is Calvert's estimate of the amount of its pro rata share of the pool's losses. It has, of course, paid nothing to date.

courts under any of Calvert's various legal theories.[2]

There was only one difference between Calvert's positions in the state and federal courts. While it had pleaded rule 10b–5 under the 1934 Act as grounds for rescission in both courts, it had alleged rule 10b–5 as grounds for damages only in the federal court action, presumably because of the exclusive jurisdiction granted to federal courts over suits to enforce damage liabilities created by the 1934 Act, 15 U.S.C. §§ 78a *et seq.* This was obviously a questionable claim, however, because as counsel for Calvert candidly admitted in argument to the Supreme Court, there are no damages to be recovered by Calvert in this case, and rescission is the relief which Calvert really seeks. *See Will v. Calvert Fire Insurance Co.,* Transcript of Oral Argument of April 19, 1978 at 32–33, 35–36.

If this were not the case—if Calvert were genuinely seeking relief under rule 10b–5, relief that the state court was without jurisdiction to award—this Court's decision on the motion to stay might well have been different. *See Will v. Calvert Fire Insurance Co.,* 437 U.S. 655, 668, 98 S.Ct. 2552, 2561, 57 L.Ed.2d 504 (Brennan, J., dissenting); *Cotler v. Inter-County Orthopaedic Association,* 526 F.2d 537 (3d Cir. 1975).

The issues before the state and federal courts are, therefore, substantially identical. In recognition of this fact, we invited Judge Arthur Dunne of the Circuit Court of Cook County, before whom the state court case was pending, to sit with us for the oral argument on the question of whether a participation in the reinsurance pool in question was a security under the 1933 and 1934 Acts. At that oral argument, counsel for Calvert contended that it was a security and counsel for Amreco that it was not.

At the time of this Court's stay order, it had been our expectation that we and not the state court would rule upon the specific legal issue of whether Calvert's participation in the reinsurance pool involved the sale of a security by Amreco to Calvert within the meaning of the federal securities laws. Accordingly, we were prepared to decide the "security" issue in the first instance to assure Calvert a prompt adjudication of that preliminary question.

The "security" issue, however, was shortly thereafter decided by the state court in an order by Judge Dunne dated June 16, 1975, striking certain counts of Calvert's counterclaim on the ground that the reinsurance agreement was not a security under either the 1933 or 1934 Acts or under Illinois law, a decision which has since been affirmed on appeal, *American Mutual Reinsurance Co. v. Calvert Fire Insurance Co.,* 52 Ill.App.3d 922, 9 Ill.Dec. 670, 367 N.E.2d 104 (1977), *cert. denied,* 436 U.S. 906, 98 S.Ct. 2238, 56 L.Ed.2d 404 (1978). Following Judge Dunne's order, which decided the security issue under both the 1933 and 1934 Acts, all proceedings in 'this Court were stayed until such time as it would appear that either of the litigants required that the stay be terminated to assure a speedy and just adjudication. Because of this possibility, periodic status conferences have been held in this Court to monitor the progress of the state litigation.

Since the state courts clearly had jurisdiction over all the 1933 and 1934 Act claims except the dubious claim for money damages, and since Judge Dunne had held that there was no security under either the 1933 or 1934 Acts or under Illinois law, Calvert had no apparent need for a federal adjudication of whether or not the reinsurance pool agreement constituted a security under either the 1933 or 1934 Act. We concluded, therefore, that Calvert's demand that we

---

**2.** There may be one exception. Calvert has contended that its participation in the reinsurance pool was a security within the meaning of the 1933 Act, 15 U.S.C. §§ 77a *et seq.,* which should have been registered, and that, therefore, Calvert has a right under section 12(1) to "recover the consideration paid" whether or not there had been any misrepresentations.

This issue was raised in both courts, as state and federal courts have concurrent jurisdiction over claims arising under the 1933 Act. Calvert has apparently chosen to deemphasize its section 12(1) claim, perhaps in part because it apparently has paid no consideration, and therefore it is not clear that there is anything to be recovered.

decide the same questions already determined by the state court was intended to delay the proceedings in the state court and to obtain two adjudications with two possible appeals of the same legal issue.

It seemed obvious to us that this federal action, which was filed six months after Amreco instituted the state court suit on behalf of the pool, and on the same day Calvert filed its answer in the state court, was a reactive defensive maneuver. As previously indicated, the only issue in its federal complaint which was not in its state court answer was the 1934 Act damages claim. Since Calvert had paid nothing, there were, as Calvert's counsel acknowledged to the Supreme Court, no damages which it could possibly recover.

We concluded, therefore, that the federal case was primarily a tactical maneuver to delay the determination of whether or not Calvert owes the pool its share of the 1974 losses. That Calvert was not basically interested in a federal determination of whether or not the reinsurance pool involved a security also seemed obvious to us from the fact that it had not removed the state court action to the federal court which, as a non-resident, it was entitled to do. 28 U.S.C. § 1441(a), (b). It chose to answer in the state court and file this duplicative action.[3]

Whatever Calvert's motivation in filing this action, it is clear that the question of whether or not Calvert was misled is relevant to all the defenses asserted by it in the state court action and has no special significance in its theoretical 1934 Act damages claim.

## THE MANDAMUS ACTION

Pursuant to a petition by Calvert, the United States Court of Appeals for the Seventh Circuit on August 15, 1977, issued a writ of mandamus ordering this Court "immediately" to adjudicate certain of Calvert's claims (those arising under the 1934 Act), *Calvert Fire Insurance Co. v. Will,* 560

F.2d 792 (1977), and implying that other of Calvert's claims should be adjudicated immediately as well, *see id.* at 798 n.6. The court of appeals reasoned that, while this Court's stay when granted had been correct under prior law, that prior law had been overruled by the decision of the Supreme Court in *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

On June 23, 1978, the court of appeals' decision granting the writ of mandamus was reversed by the Supreme Court. *Will v. Calvert Fire Insurance Co.,* 437 U.S. 655, 98 S.Ct. 2552, 57 L.Ed.2d 504 (1978).

■ As a result of the unusual procedural history of this case, which has seen the grant of two extraordinary writs by higher courts, it is appropriate at this time to clarify the posture of the litigation in this Court. Accordingly, we exercise our discretion this day and order that all aspects of Calvert's federal action continue to be stayed because all significant aspects of Calvert's federal action are before the state court. This stay is not final, and will be vacated if—but only if—it is demonstrated by either litigant that the avoidance of unfair prejudice so requires.

The stay granted this day is not "simply the product of the normal excessive load of business in the District Court," cf. *Will v. Calvert Fire Insurance Co., supra,* 98 S.Ct. at 2560, although that excessive workload is real. Rather, the stay is essential to assure efficient justice to the litigants and to maintain the integrity of the two court systems.

As previously indicated, only Calvert's count seeking damages for alleged violations of rule 10b–5 promulgated under the 1934 Act, involves any issue of exclusive federal jurisdiction. Rule 10b–5 is in most respects less advantageous to Calvert than other legal grounds it has invoked, because to recover damages under rule 10b–5, Calvert would have to demonstrate that Amre-

---

**3.** Calvert in the Supreme Court asserted that it had erred in failing to remove within the prescribed time. Whatever the reason, the result

is that virtually identical suits pend in both state and federal courts.

co acted with scienter, *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), whereas Calvert could obtain equivalent relief under state common law principles of rescission without proving scienter. The conclusion is therefore inescapable that Calvert has elected to emphasize its rule 10b–5 claim as a tactic to use the federal court's exclusive jurisdiction to secure duplicate adjudications. The Supreme Court has made very clear that rule 10b–5 must not be allowed to become a source of "vexatious litigation" federalizing state controversies and overriding state policies. *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 479, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 740, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Calvert's use of rule 10b–5 to interfere with prompt adjudication of Amreco's contract claim is a new and most wasteful form of vexatious litigation.

It would not, we believe, be fair if Calvert were able to pursue a dubious claim over which federal courts have exclusive jurisdiction and thereby interfere with the state court's timely resolution of the genuine controversy. *Cf. Will v. Calvert Fire Insurance Co., supra,* 98 S.Ct. at 2559 and n.8; *General Atomic Co. v. Felter,* 434 U.S. 12, 98 S.Ct. 76, 54 L.Ed.2d 199 (1977).

The foregoing is little different in substance from this Court's opinion of May 6, 1975. We did not spell out at that time all the background details because we believed that the power—indeed, the duty—of district courts to stay wasteful and duplicative litigation was clearly and firmly established, both generally as a principle of the federal judicial system, *Landis v. North American Co.,* 299 U.S. 248, 254–55, 57 S.Ct. 163, 81 L.Ed.2d 153 (1936), and specifically as the law of the Seventh Circuit in a case such as this where rule 10b–5 and the exclusive jurisdiction provisions of the 1934 Act were used as a tool to create delay and duplication, *Aetna State Bank v. Altheimer,* 430 F.2d 750 (7th Cir. 1970); *see Calvert Fire Insurance Co. v. Will, supra,* 560 F.2d at 795.

It has been suggested that these well-established principles of district court discretion were overruled by *Colorado River,* and that the grant of a stay in the instant case was therefore not proper. *Calvert Fire Insurance Co. v. Will, supra,* 560 F.2d at 795; *Will v. Calvert Fire Insurance Co., supra,* 98 S.Ct. at 2563 (Brennan, J., Burger, C. J., Marshall and Powell, JJ., dissenting). We do not believe that *Colorado River* was intended to provide defendants in state court suits a federal forum in which to bring tactical defensive actions in which the only exclusive federal claim is a contrived one and to foreclose federal district judges from taking appropriate action in such cases.

There are at least four reasons why we believe *Colorado River* does not prohibit our original entry and current continuation of the stay order. First, the result in *Colorado River,* affirming the federal district court's dismissal of the prior federal declaratory action, was based on considerations of "wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." 424 U.S. at 817, 96 S.Ct. at 1246. This is wholly consistent with our stay in the instant litigation based on the same considerations as well as principles of fairness, efficiency, and avoidance of duplicative trials and appeals of the same issues in federal and state courts. We do not find the statement in *Colorado River* that the general rule between state and federal courts that "the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction," 424 U.S. at 817, 96 S.Ct. at 1246, is to the contrary.

Second, *Colorado River* concerned a *dismissal* of federal litigation, "clos[ing] the door of the federal courthouse," 424 U.S. at 823, 96 S.Ct. at 1249 (Stewart, J., dissenting), whereas this federal forum remains available to the litigants upon a showing that the state court is unable to adjudicate all relevant issues promptly or fairly. We do not believe that the difference is inconsequential. *See Will v. Calvert Fire Insurance Co.,* 98 S.Ct. at 2558; *Calvert Fire*

*Insurance Co. v. Will, supra,* 560 F.2d at 796 n.5 (Bauer, J., statement). *But see Will v. Calvert Fire Insurance Co., supra,* 98 S.Ct. at 2563 (Brennan, J., Burger, C. J., Marshall and Powell, JJ., dissenting); *Calvert Fire Insurance v. Will, supra,* 560 F.2d at 796. While entry of a stay order raises the possibility of *res judicata* with respect to the state court's judgment on identical issues, as may be the case here with respect to the state court's finding that there is no "security," the salutory insurance of timely state court proceedings as well as the avoidance of statute of limitations problems with respect to the federal suit renders a "stay" order of substantially different importance than an outright dismissal.

Third, the clear intention of *Colorado River* was not to limit the district court's discretion recognized in *Landis v. North American Co.* We have made the "carefully considered judgment" required by *Colorado River,* 424 U.S. at 818, 96 S.Ct. at 1246, and have found that the combination of factors counselling against an "immediate" adjudication in this case outweighs our "heavy obligation to exercise jurisdiction." 424 U.S. at 820, 96 S.Ct. at 1246.

Fourth, *Colorado River* did not consider, as we must in this case of substantially identical state and federal proceedings, the failure to utilize the removal procedure created by 28 U.S.C. § 1441. In this case, Calvert had available the removal provision of § 1441 if it wished to secure a federal forum for adjudication of the issues raised in the state cause of action. Calvert's mere addition of a dubious rule 10b–5 claim for damages in the federal complaint should not permit it to circumvent the statutory removal procedures so as to entitle it to two forums in which to secure an adjudication of its identical claims.

For these reasons, we believe that Calvert's request in 1975 for our adjudication of the at best peripheral "security" issue was without substance. However, in granting a writ of mandamus, a distinguished panel of the Seventh Circuit Court of Appeals held otherwise: that the Supreme Court had intended in *Colorado River* to limit the discretion of district judges to stay wasteful duplicative and reactive defensive litigation.

We sought certiorari from the Supreme Court of the United States so that clear standards could be provided to all district judges. While the Supreme Court reversed the Seventh Circuit's grant of mandamus, the Court has given little assistance to district courts in how to exercise their discretion in granting stays where substantially identical litigation is pending in both federal and state courts. Indeed, *Will v. Calvert Fire Insurance Co.* may have introduced uncertainty into the area of the law that we had hoped would be clarified.[4] It is no longer clear to us, and we assume to others, that a district court correctly follows principles set forth by the Supreme Court when it exercises its discretion to stay duplicative, reactive and later-filed suits. Further clarification is therefore essential.

The facts of this particular case involving Calvert and Amreco are illustrative of the problems that district courts face because they demonstrate the ease with which a rule 10b–5 cause of action over which federal courts have exclusive jurisdiction can be contrived in a commercial dispute. By seeking two adjudications of the "security" issue and delaying discovery proceedings in the state court while pursuing the federal court proceedings, counsel for Calvert have undoubtedly served the interests of their client well.[5] As a result of the combination

---

4. Four justices were of the opinion that *Colorado River* did not warrant or require the issuance of the writ of mandamus ordering us to vacate our stay and to decide "immediately" the 1934 Act claim. Four other justices were of the opinion that it did. Justice Blackmun joined the first four on the ground that the mandamus writ should not have been issued until we had had an opportunity to consider the

application of *Colorado River* to the facts of this case. The decision is, therefore, obviously something less than a clear direction to district judges as to the proper application of *Colorado River* in determining what discretion they have to stay cases.

5. Calvert sought and obtained first from Judge Dunne and later from the Illinois Supreme Court, a stay of all discovery in the state court

of delaying discovery in the state court action while the federal and state appeals and the United States Supreme Court proceedings were pursued, they have undoubtedly postponed for several years the determination of Calvert's alleged liability to the 1974 reinsurance pool. Given the difference between today's commercial interest rates and the statutory interest rate, this may represent a substantial amount of money if Calvert is ultimately found to be obligated to the pool for its share of the 1974 losses.

It seems inevitable that, unless the federal district courts are able to resist such dilatory tactics and stay duplicative litigation in appropriate cases, such tactics will proliferate.[6] We find it difficult to believe that the Seventh Circuit and the Supreme Court truly desire that the district courts expend their resources in racing state courts to judgment on duplicative and re-

active claims and permit state court defendants to delay the state court proceedings by so doing.

■■■ The instant dispute between Calvert and Amreco could be decided on a number of grounds, including res judicata,[7] the underlying question of whether a security was sold by Amreco to Calvert[8] and the state grounds of fraud, etc. raised by plaintiff. However, we believe that it is important not to decide the case at this time on any of these grounds, because the appellate courts have raised the larger issue of the extent to which district judges have authority to supervise the conduct of litigation before them to assure prompt justice. We believe it important that these appellate courts have a further opportunity to clarify this matter, and to reaffirm, we hope in stronger language, the necessity of broad control by district courts of their own dock-

---

proceedings until both the United States Supreme Court's denial of certiorari on the Illinois Appellate Court's affirmance of Judge Dunne's ruling and the United States Supreme Court's reversal of the issuance of the writ of mandamus became final which occurred a few months ago. We have been advised at our latest status report that discovery in the state court has now commenced.

6. See also Straus v. Holiday Inns, Inc. [Current] Fed.Sec.L.Rep. (CCH) ¶ 96, 383 (S.D.N.Y.1978).

7. We have, of course, not formally considered the res judicata question. It is clear, however, that the state court decision involved a finding between the same parties here present that participation in the reinsurance pool was not a security under either the 1933 Act, the 1934 Act or state law.

It should be noted that, whatever res judicata effect the state court determination has, it had that effect as soon as Judge Dunne handed down his final decision on the security issue on June 16, 1975. First, although Judge Dunne's determination was in the form of an interlocutory decision dismissing certain counts in Calvert's counterclaim, and not a final judgment disposing of all issues and appealable by right, it was a final determination of the security issue and therefore entitled to res judicata effect. See, e. g., Zdanok v. Glidden Co., Durkee Famous Foods Division, 327 F.2d 944, 955 (2d Cir.), cert. denied, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964); Sherman v. Jacobson, 247 F.Supp. 261, 267–70 (S.D.N.Y.1965); Restatement of Judgments § 41 Comment c (1942).

Second, a judicial decision becomes res judicata not when the Supreme Court of the United States denies certiorari for the final time on the final aspect of the case, but as soon as a final decision is made by a judge. See Huron Holding Corp. v. Lincoln Mine Operating Co., 312 U.S. 183, 188–89, 61 S.Ct. 513, 85 L.Ed. 725 (1941); Reed v. Allen, 286 U.S. 191, 52 S.Ct. 532, 76 L.Ed. 1054 (1932). (We believe that this point may not have been fully brought to the attention of Justices Brennan, Marshall, Powell and the Chief Justice because of their apparent belief that the possibility that a state court decision would become res judicata at some future time was a reason for this Court to adjudicate the "security" issue immediately following Judge Dunne's decision. See 98 S.Ct. at 2564 (Brennan, J., Burger, C. J., Marshall and Powell, JJ., dissenting)). As soon as Judge Dunne made his determination, the difficult res judicata issue was presented. It was not this Court's stay that created the res judicata issue. Indeed, staying this litigation was one way of perhaps obviating a difficult decision on the res judicata question: if the state court grants Calvert its desired relief on grounds other than the federal securities laws, that would make the security issue in this Court moot. This is one of the reasons why a stay was and is appropriate in this case.

8. It is, of course, our view, as we indicated in open court shortly after Judge Dunne's unexpected ruling, that Calvert's participation in the reinsurance pool managed by Amreco did not constitute the sale of a security by Amreco to Calvert within the meaning of the federal securities laws.

ets in the interests of efficiency, economy and avoidance of duplication in litigation.

We do not mean to imply that district courts should invariably stay federal securities litigation brought in reaction to claims filed in a state court. There may be instances where a litigant properly requires concurrent proceedings to secure the complete adjudication of its claim and to prevent some prejudice at the hands of a state court. As Calvert has demonstrated, however, it is not difficult to create through reactive litigation a contrived cause of action over which federal courts have exclusive jurisdiction, even when the original state court is fully empowered to resolve all genuine issues and provide justice to all parties.

Concurrent adjudication in such a case is merely a means for a litigant to duplicate and delay. That is why it is so essential that a district court have discretion to stay such duplicative litigation; because in most instances only the district judge will be familiar enough with the circumstances of a lawsuit to decide whether an application for simultaneous adjudication in two courts is a plea for justice or a delaying tactic.

We hesitate to conclude that the Seventh Circuit and the Supreme Court intend and require that district judges spend their time deciding duplicative claims. This result seems utterly inconsistent and irreconcilable with the Chief Justice's repeatedly expressed desire that the federal courts become more efficient in administering justice, and that wasteful litigation tactics be discouraged. Nor is it conducive to amicable relations between federal and state courts. Therefore, if this is the result desired by the higher courts, it should be stated clearly to provide guidance to the district courts. Accordingly, and because we believe the stay granted this day is within the discretion of this Court and not subject to review by the court of appeals on mandamus, *Will v. Calvert Fire Insurance Co., supra,* we find, as required by 28 U.S.C. § 1292(b), that the stay order involves a controlling question of law as to which, unfortunately, there is apparently substan-

tial ground for difference of opinion and that an immediate appeal from this order may materially advance the ultimate termination of this litigation as well as clarify the important question of a district court judge's discretion with respect to granting a stay and controlling the court's docket in the light of *Colorado River.*

An order consistent with the foregoing will enter.